

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| DENNIS KOESTERER, on behalf of himself and all others similarly situated, | Civil Action No.: |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | JURY TRIAL DEMANDED |
| WASHINGTON MUTUAL, INC., KERRY K. KILLINGER, DAVID C. SCHNEIDER and THOMAS W. CASEY, | |
| Defendants. | |

Plaintiff, Dennis Koesterer ("Plaintiff"), alleges the following based upon the

investigation of Plaintiff's counsel, which included, among other things, a review of the

defendants' public documents, conference calls and announcements made by defendants, United

States Securities and Exchange Commission (the "SEC") filings, wire and press releases

published by and regarding Washington Mutual, Inc. ("Washington Mutual" or the "Company"),

securities analysts' reports and advisories about the Company, the complaint filed by the

Attorney General of the State of New York against the First American Corporation and

information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought by Plaintiff on behalf of all

purchasers of the publicly traded securities of Washington Mutual between July 19, 2006 and

October 31, 2007 (the "Class Period"). The complaint seeks to pursue remedies under the

Securities Exchange Act of 1934 (the "Exchange Act").

2.      Washington Mutual is the nation's largest savings and loan.  The Company is incorporated in Washington, and headquartered in Seattle, Washington, with well over twenty bank branches and "home loan" centers in this District.

3.      On November 1, 2007, the Attorney General of the State of New York filed a lawsuit against First American Corporation ("First American") and First American's real estate appraisal subsidiary, eAppraiseIT (the "First American Complaint").  Washington Mutual is eAppraiseIT's largest customer and it provides real estate appraisal services to Washington Mutual on mortgages and "second lien" home loans, such as home equity loans and home equity lines of credit.  According to allegations against First American, during the Class Period, Washington Mutual used only two outside appraisal firms, eAppraiseIT and Lender's Service, Inc.  The First American Complaint alleges that beginning in 2006, eAppraiseIT provided over 260,000 appraisals for Washington Mutual.

4.      Andrew Cuomo, the New York Attorney General, alleges in the complaint that beginning in "Summer 2006" Washington Mutual put pressure on eAppraiseIT to increase the appraised value of homes:

> First American and eAppraiseIT have abdicated their role in providing "third-party, unbiased valuations" for eAppraiseIT's largest client, WaMu. Instead, eAppraiseIT improperly allows WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close. eAppraiseIT compromises its independence even while publicly touting that independence, and despite myriad warnings from its senior management team about the illegal collusion inherent in the  compromises it is making. Instead of preserving its independence, which would have protected consumers and business customers alike, eAppraiseIT chose to protect only itself. And senior executives at First American, though warned by eAppraiseIT's senior management of its compromised independence, nonetheless directed eAppraiseIT to continue its

wrongful conduct.

5.      Throughout the Class Period, however, Defendants failed to disclose the undue and improper pressure placed on First American by Washington Mutual executives in attempt to obtain higher appraisal values.  As stated in the First American Complaint such inflated appraisals create an enhanced risk of "loss of value in a foreclosure proceeding."

6.      Defendants' improper appraisal practices during the Class Period (1) rendered the Company's statements about its compliance with ethical and legal guidelines materially false and misleading; (2) rendered defendants' statements about the adequacy of the Company's internal controls materially false and misleading; (3) were not disclosed and thus constitute an ongoing omission of material fact related to the Company's core home loan business; (4) caused certain of the Company's reported financial information, including assets associated with home loans held in portfolio or held for sale and income from home loans sold to third parties, to be materially overstated throughout the Class Period; (4) caused the Company's loan loss reserves, provisions for doubtful account and contingent liabilities to be materially understated during the Class Period; and (5) caused Defendants to report financial results that were in violation of GAAP.

7.      On October 17, 2007, after the close of the financial markets, Washington Mutual announced its results for the third quarter of 2007 and during a conference call to discuss those results revealed that its anticipated fourth quarter 2007 writedowns of home loan assets would be $1.3 billion greater than previously disclosed.  These writedowns were caused, at least in part, by the impairment of loan assets that were originated based on inflated appraisals.  Over the ten trading days following this announcement, Washington Mutual's stock price decline by $5.19 per share, or 15.6%, from its $33.07 closing price on October 17, 2007.

8.    On November 1, 2007, following the announcement of the First American Complaint, Washington Mutual shares fell further over the next two trading days, closing at $23.81 on November 2, 2007, down $4.07 per share, or 15%, from the $27.88 per share closing price on October 31, 2007.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rule 10b-5 promulgated thereunder 17 C.F.R. § 240.10b-5.

10.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

11.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Certain of the acts and transactions alleged herein occurred in substantial part in this Judicial District, Washington Mutual has a substantial presence in this judicial district and the First American Complaint was filed in this judicial district in the Supreme Court of the State of New York, County of New York.

12.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

13.    As set forth in the attached Certification, Plaintiff purchased Washington Mutual securities during the Class Period at artificially inflated prices and was damaged thereby.

14.    Defendant Washington Mutual is a Washington corporation, with its principal place of business located at 1301 Second Avenue, Seattle, Washington, 98101.  In its Form 10-K for fiscal 2006, the Company acknowledged that it was subject to regulation by the Office of Thrift Supervision, among other state and federal authorities:

> As a savings and loan holding company, Washington Mutual, Inc. is subject to regulation by the Office of Thrift Supervision (the "OTS").  The Company's banking subsidiaries are subject to regulation and examination by the OTS (their primary federal regulator) as well as the Federal Deposit Insurance Corporation ("FDIC").  Its nonbank financial subsidiaries are also subject to various federal and state laws and regulations.

15.    Defendant Kerry K. Killinger ("Killinger") is, and was at all times relevant hereto, the Chief Executive Officer and Chairman of WaMu's Board.

16.    Defendant Thomas W. Casey ("Casey") is, and was at all times relevant hereto, Executive Vice President, Chief Financial Officer and a member of the Executive Committee of WaMu.  Casey oversees all aspects of Washington Mutual's corporate finance, strategic planning and investor relations functions.

17.    Defendant David C. Schneider ("Schneider") is, and was at all times relevant hereto, Executive Vice President and President, Home Loans and a member of the Executive Committee.  Schneider oversees all aspects of the Company's home loans business including prime mortgage lending, subprime mortgage lending, mortgage banker finance, and specialty mortgage finance.

18.    Defendants Killinger, Casey and Schneider are collectively referred to hereinafter as the Individual Defendants.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Washington Mutual's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and

institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to or shortly after their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their positions and access to material non-public information available to them, each of

these defendants knew that the adverse facts specified herein had not been disclosed to and were

being concealed from the public and that the positive representations which were being made were

then materially false and misleading. The Individual Defendants are liable for the false statements

pleaded herein, as those statements were each "group published" information, the result of the

collective actions of the Individual Defendants and should also be deemed "control persons" of the

Company.

## SUBSTANTIVE ALLEGATIONS

### Background - Home Loan Industry and the Role of Appraisers

19.    The First American Complaint provides as background the following description of

the structure of the home lending business and the reasons why banks that originate mortgages no

longer have an incentive to ensure that home loans are predicated upon fair and accurate appraisals

(emphasis added):

> 12.    Most people interested in purchasing or refinancing a home
> ("borrowers") seek a financial institution (a "lender") to lend them money on the
> most favorable repayment terms available. Traditionally the lender, as part of
> agreeing to loan the funds, wanted to ensure that the borrower was able to repay the
> loan and that the loan was adequately collateralized in case the borrower defaulted.
> The borrower and the lender had a common interest in accurately valuing the
> underlying collateral because both wanted to be sure the borrower was not paying too
> much for the property and would be able to meet the repayment terms, or that – in the
> event of default and foreclosure – the property value could support the loan.
>
> 13.    Today, the landscape of the mortgage industry is quite different from

this traditional model. Rather than holding the mortgage loans, lenders now regularly sell these mortgages in the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, securitized, and sold to the general public as mortgage backed securities. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and aiding its stock price. Today, the vast majority of mortgage loans are sold to investment banks or GSEs, leaving the original lender holding far fewer mortgages in its portfolio.

14. This reconfiguration of the way that mortgages are held has transformed the incentives in the industry. **Specifically, it has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans. Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest in ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lenders' profits are determined by the quantity of loans they successfully close, and not the quality of those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow the loan to close, whether or not the appraisal accurately reflects the home value.**

20. The First American Complaint states as follows concerning the legal requirements

enacted to ensure independent appraisals of real estate:

18. Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent. The Uniform Standards of Professional Appraisal Practice ("USPAP") are incorporated into federal and New York law. See 12 C.F.R. § 34.44; 19 NYCRR § 1106.1. USPAP requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).

19. Federal law sets independence standards for appraisers involved in federally regulated transactions. See 12 U.S.C. §§ 3331, *et seq*. The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states

that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction."  12 C.F.R. § 34.45.

20.    In 2005, federal regulators including the OTS [Office of Thrift Supervision] published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." With regard to appraisal independence, the document provides:

> 3.    Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?
>
> Answer:    The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff.  Loan production staff should not select appraisers.
>
> * * *
>
> 5.    When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided the list is not under their control?
>
> Answer:    Yes, loan production staff may use a revolving, board approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. Staff responsible for the development and maintenance of the list should be independent of the loan production process. . . . Further, there should be periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that controls exist to ensure independence.

21.    Generally, USPAP and the federal laws and regulations which incorporate the provisions set forth above, preclude lenders from exerting influence over the appraisal process or appraisal value.

Doc. 158816                                         8

**Washington Mutual's Improper Manipulation
of eAppraiseIT to Obtain Infalted Appraisals**

22.    The First American Complaint alleges a complex scheme undertaken by senior

Washington Mutual executives to manipulate the value of appraisals provided by eAppraiseIT. The

relevant allegations are excerpted as follows:

28.    By email dated September 29, 2006, a WaMu executive wrote to
eAppraiseIT's senior executives to define the responsibilities of eAppraiseIT's
ABMs as to ROVs and value disputes:

> . . . the four appraisers/reviewers would be directly involved in
> escalations dealing with: ROVs, Valuation issues where the purchase
> price and appraised value differ with no reconciliations/ justifications
> by the appraiser, Value cuts which we continue to receive from your
> third party reviewers (Wholesale), proactively making a decision to
> override and correct the third party appraiser's value or reviewer's
> value cut, when considered appropriate and supported . . ..

In this way, from the outset, WaMu sought to use eAppraiseIT to ensure that
appraisals did not come in lower than WaMu wanted.
                                                              ***
29.    Almost immediately after WaMu retained eAppraiseIT to provide
appraisals in early Summer 2006, WaMu's loan production staff began complaining
that the appraisal values provided by eAppraiseIT's appraisers were too low. It was
clear, and eAppraiseIT well understood, that WaMu's dissatisfaction was largely due
to the fact that eAppraiseIT's staff and fee appraisers were not "hitting value," that
is, were appraising homes at a value too low to permit loans to close.
                                                              ***
31.    A week later, on August 15, 2006, eAppraiseIT's Executive Vice
President advised eAppraiseIT's President that WaMu's loan officers would often
pressure WaMu's internal appraisal field managers for an "extra few thousand," or
"tell[] them specifically what they needed," or would "ask for several ROVs on the
same property." eAppraiseIT's Executive Vice President explained that "[h]aving
loan officers ask for a few thousand dollars because it is within the range is
something we do not currently do for any client. . . . It is also direct pressure on the
appraiser for a higher value without any additional information."
                                                              ***
34.    During this period, First American was seeking additional business
from WaMu in other areas. But WaMu expressly conditioned giving any future
business to First American on success with eAppraiseIT. By email dated September

27, 2006, a First American senior executive advised other senior executives at First American and eAppraiseIT about a conversation he had with the President of WaMu Mortgage about long-term business prospects.

The First American executive explained that:

> [WaMu] and I discussed our long-term relationship including the money we have on deposit there and our other current business relationships. I told him we would like to expand those relationships. And in exact terms, we would like one half of their flood business, which they currently give 100% to [Corporation A] and their tax business is divided 3 ways among [3 corporations] and that we would like to take [Corporation A's] tax business.

According to the First American executive, WaMu responded as follows:

> He said that if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship including tax and flood.

***

37.    In February 2007, WaMu directed eAppraiseIT to stop using its usual panels of staff and fee appraisers to perform WaMu appraisals. Instead, WaMu's loan origination staff demanded that eAppraiseIT use a Proven Panel of appraisers selected by the loan origination staff, who were chosen because they provided high values.

38.    By email dated February 22, 2007, eAppraiseIT's President explained to senior executives at First American WaMu's motives for demanding the Proven Panel:

> We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's "Proven Appraisers" . . . . We will pay their appraisers whatever they demand. Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV. (Emphasis added).

***

41.    In February 2007, eAppraiseIT simply capitulated to WaMu's demands.  In an email on February 22, 2007, eAppraiseIT's President told senior executives at First American "we have agreed to roll over and just do it."  He explained that "we were willing to live with the change if they would back us up with the appraisers and tell them that simply because they are rated as Gold Preferred does

not mean that they can grab all the fees. They agreed." In other words, for the right price in fees, eAppraiseIT was willing to go along with the Proven Panel.

***

43.    On March 5, 2007, WaMu confirmed the primary role of its loan origination staff in picking appraisers in a follow-up email, in which it explained that the Proven Appraiser List is being created. This will replace the WaMu preferred list. The initial list of names will be provided by lending with a minimum of two appraisers per area/county. The list will then be reviewed and approved by the Appraisal Business Oversight Team and will be checked against our most recent ineligible list. Final list will be provided to VMC's [vendor management companies]. Majority of work must be assigned to the appraisers on the Proven Appraiser List on a Priority Basis. (Emphasis added).

***

48.    On April 17, 2007, eAppraiseIT's President wrote to senior executives at First American, describing the issues with WaMu as follows:

> In short, the issues are using their designated appraisers as mandated by the WaMu production force at 20% gross margin and bypassing our panel. **We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation.** (Emphasis added).

***

57.    On May 11, 2007, eAppraiseIT's Executive Vice President wrote to eAppraiseIT's President that "currently WAMU is controlling the appraiser panel. They are selecting the appraisers and calling them 'proven' appraisers. These appraisers are being chosen by their sales force. First American eAppraiseIT (FA eAppraiseIT) is obligated to use these appraisers." According to eAppraiseIT's Executive Vice President, WaMu was using a Proven Panel because of the "low values" from eAppraiseIT's appraisers.

***

71.    In one specific example, in or about December 2006, a particular appraiser ("Appraiser A") was approved to be an appraiser on the Proven Panel. From January 25, 2007 through May 7, 2007, Appraiser A conducted five appraisals for eAppraiseIT with respect to WaMu properties. For each appraisal, WaMu requested a reconsideration of value. In each instance, Appraiser A refused to increase the value.

72.    Shortly thereafter, Appraiser A was removed from the Proven List and placed on the WaMu inactive list. He was then told by a WaMu sales assistant that he was removed from the panel because he did not increase values in response to these reconsiderations of value. This same WaMu sales assistant told Appraiser A that many appraisers who had previously been removed from WaMu's list of active appraisers for conducting fraudulent appraisals were being reinstated on WaMu's Proven List in order to help ensure that appraisals would come in at sufficiently high

value to permit the loans to close.

73.    On May 30, 2007, Appraiser A wrote to eAppraiseIT regarding the WaMu Proven Panel.   In the email, Appraiser A wrote that: "We continued to provide this high level of service when eAppraiseIT took over as appraisal management. With no explanation or warning, I was removed from the assignment rotation in mid April of this year. I respectfully ask to be reinstated as an active preferred appraiser."

74.    Following receipt of Appraiser A's email, on May 30, 2007, an eAppraiseIT Appraisal Specialist wrote to eAppraiseIT's Executive Vice President, Chief Operating Officer and Chief Appraiser:

> I was working with two good, solid long-time wonderful appraisers in NY and CT until right after the WaMu Proven Panel was formed. They were both removed very soon after for no apparent reason. We were having value issues, however, I felt their work was very defendable and supportable, and kept copious notes on our dealings. They have continued to keep in touch with me, in order to find out why they were removed from the panel. (Emphasis added).

75.    On May 31, 2007, eAppraiseIT's Chief Appraiser replied:

> First he was on the Master List so put on WAMU Proven and then as the list went around he was REMOVED. The probability that a loan officer requested him to be removed is pretty high I think because that is what they did with the Master List; they sent it out to Lending to choose.

76.    To date, Appraiser A remains off the Proven Panel.

                                        ***

81.    Similarly, on April 17, 2007, a third appraiser ("Appraiser C") wrote to eAppraiseIT that:

> This is the second Wamu Appraisal quality assurance issue I have received from Wamu in the past 2 months. Both as a result of an appraisal I completed that did not come in to their predetermined value for a "valued" Wamu client. I was pressured for 2 weeks to change both my value and the conditions of my appraisal report . . . both of which were violations of USPAP, FANNIE MAE and the Supplemental Standards I am required to observe and am bound by my license to complete. Since that time, I have been singled out by WaMu and have been pressured on every appraisal I have completed

that did not reach a pre-determined value. I feel that Wamu is in process of "blacklisting" me as an approved Wamu appraiser by going after each appraisal I complete and looking for violations." (Emphasis added).

82.    Appraiser C wrote this email after having been pressured and harassed to increase values on two appraisals, after WaMu had requested ROVs and she had declined to increase the values. Shortly after her refusal to increase these values, she received two "Unacceptable Appraisal Notifications" from WaMu. After having been harassed and targeted with "unacceptable" strikes, she withdrew from WaMu's panel in order to avoid being removed against her will.

***

86.    Further, email exchanges between WaMu and eAppraiseIT show that WaMu repeatedly pushed eAppraiseIT's ABMs to increase appraised values so that loans could close. For example, in one exchange with an eAppraiseIT review appraiser, a WaMu loan officer wrote that "Basically, if we don't get at least the appraised value of $3,650,000 . . . we lose the deal." (Ellipses in original). Earlier that day, this loan officer told eAppraiseIT that "if we don't have a definitive $$ appraised value then the borrower will go to another lender with a higher appraised value of $4mm. Please . . . at least . . . keep this value at the original appraised value of $3,650,000." (Ellipses in original).

87.    On May 23, 2007, eAppraiseIT's Chief Appraiser described these comments as "a clear picture of Lender Pressure on behalf of WaMu."

88.    eAppraiseIT received other communications from WaMu in which WaMu attempted to influence the appraised values of specific properties. For example, on May 24, 2007, eAppraiseIT's Chief Operating Officer wrote to eAppraiseIT's President that: "We have received in the past, and now most recently with the Sag Harbor event (which incidentally just happens to be a New York property), communications where it could be viewed that EA did experience some level of influence to increase a value beyond that which we concluded in our own analysis was not supported."

89.    eAppraiseIT's internal appraisal log entries indicate that its Review Appraisers and ABMs increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close. For the period of November 2006 to May 2007, there were 8 desk reviews performed by ABMs and 1 desk review performed by the Appraisal Specialist relating to properties in New York, all of which were for WaMu. The appraised values were increased in each of the 9 desk reviews completed, as follows: from $825,000 to $850,000, $230,000 to $240,000, $415,000 to $420,000, $1,550,000 to $2,270,000, $720,000 to $730,000, $535,000 to $556,000, $580,000 to $587,000, $500,000 to $525,000.

90.     This level of contact between WaMu's loan production staff and eAppraiseIT's ABMs is prohibited by USPAP's independence requirements and by state and federal law.

**Washington Mutual's Business
and Use of Inflated Appraisals**

23.     In its Annual Report for 2006 on Form 10-K, filed with the SEC on March 1, 2007,

Washington Mutual describes its business as follows:

The Company has four operating segments for the purpose of management reporting: the Retail Banking Group, the Card Services Group, the Commercial Group and the Home Loans Group. The Retail Banking Group, the Card Services Group and the Home Loans Group are consumer-oriented while the Commercial Group serves commercial customers. In addition, the category of Corporate Support/Treasury and Other includes the community lending and investment operations as well as the Treasury function – which manages the Company's interest rate risk, liquidity position and capital. The Corporate Support function provides facilities, legal, accounting and finance, human resources and technology services.

24.     The Company's Home Loan business is described as follows in the 2006 Form 10-K:

The principal activities of the Home Loans Group include: (1) originating and servicing home loans; (2) managing the Company's capital market operations–which includes the buying and selling of all types of mortgage loans in the secondary market; (3) the fulfillment and servicing of the Company's portfolio of home equity loans and lines of credit; (4) originating and purchasing mortgage loans to higher risk borrowers through the subprime mortgage channel; (5) providing financing and other banking services to mortgage bankers for the origination of mortgage loans; and (6) making available insurance-related products and participating in reinsurance activities with other insurance companies.

The segment offers a wide variety of real-estate secured residential loan products and services primarily consisting of fixed-rate home loans, adjustable-rate home loans or "ARMs", hybrid home loans, Option ARM loans and mortgage loans to higher risk borrowers through the subprime mortgage channel.  Such loans are either held in portfolio by the Home Loans Group, sold to secondary market participants or transferred through inter-segment sales to the Retail Banking Group. The decision to retain or sell loans, and the related decision to retain or not retain servicing when loans are sold, involves the analysis and comparison of expected interest income and the interest rate and credit risks inherent with holding loans in portfolio, with the expected servicing fees, the size of the gain or loss that would be realized if the loans were sold and the expected expense of managing the risk related

to any retained mortgage servicing rights.

As part of its capital market activities, the Home Loans Group also generates both interest income and noninterest income through its conduit operations. Under the conduit program, the Company purchases loans from other lenders, warehouses the loans for a period of time and sells the loans in the form of whole loans, private label mortgage-backed securities or agency-guaranteed securities. The Company recognizes a gain or loss at the time the loans are sold and receives interest income while the loans are held for sale. The Company also provides ongoing servicing and bond administration for all securities issued.

25.     Through its home loan operating segment, Washington Mutual provides financing to homeowners in the form of home mortgages and "second-lien" products such as home equity loans and home equity lines of credit. These loans are either held by Washington Mutual "in portfolio" or sold to investors - "home loans held for sale."

26.     Loans held for sale are typically pooled and so called "structured finance" securities, such as "mortgage backed-securities" (MBS), "collateralized debt obligations" (CDO) and "collateralized mortgage obligations" (CMO), are issued against that pool. In determining the interest rates and prices that such securities will be issued at, the underwriters and purchasers try to assess the default risk of the underlying mortgages.

27.     An important measure of the risk in a home loan is the loan-to-value ratio ("LTV"), which is the measure of equity retained by the homeowner. A homeowner's equity is generally the difference between the value of the home and the amount of borrowing the homeowner has taken out that is collateralized by the home. For example, if a home has a value of $100,000 and a homeowner has borrowed $80,000 against that home, the homeowner has $20,000 in equity. The "loan-to-value" ratio in that situation is 8:10, or 80%. The value of the appraisal in the loan file is critical to investors in determining the LTV and the associated risk of default in the loan.

28.     In its Form 10-K for 2006, Washington Mutual acknowledges that the less equity a

homeowner has in his or her home, the greater the credit risk to the borrower:

> Home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent also expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of risk is higher when borrowers have less equity in their homes.

29.    In the prior example, the homeowner's property was valued at $100,000.  If that homeowner wanted to borrow an additional $20,000 against the value of the home, it may not be able to because such additional borrowing would reduce their equity to 0% and would result in an LTV of 1:1.  This loan would be extremely high risk and the bank may not be able to sell it or would only be able to sell it at a very steep discount or very high interest rate.

30.    Washington Mutual also acknowledges that it uses the LTV to determine the default risk of loans it holds in portfolio.  The risk of default is expressed on the Company's balance sheet as a reserve which reduces the carrying value of the loan.  Loans with high LTVs carry greater risk of nonperformance and thus must carry higher reserves.

31.    Washington Mutual's practice of inducing appraisers to overvalue real property causes increased risk of loss both for loans held in Washington Mutual's portfolio and for loans securitized and sold to third parties.

32.    In certain circumstances, investors who purchase loans from Washington Mutual have recourse against it if the borrower defaults or if there are errors or misrepresentations made in the origination or sale of the loan.  In its 2006 Form 10-K, Washington Mutual explained this as follows:

> In the ordinary course of business, the Company sells loans to third parties and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. **The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached. When a loan sold to an**

**investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made t o the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.**

33.    Inflated, non-independent appraisals of homes that serve as collateral for loans that are securitized, are among the errors or misrepresentations that would allow the purchaser of a loan to have recourse against Washington Mutual - creating undisclosed contingent risk of loss for Washington Mutual in the event it is required to repurchase non-performing loans at face value.

34.    Inflated, non-independent appraisals also cause the present value of the loans held in portfolio by Washington Mutual to be overstated, on a net basis.  As described in further detail below, Washington Mutual's 2006 Form 10-K states that the "loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance" and that it uses the loan-to-value ratio in determining risk of default or non-performance on loans held in portfolio.  Inflated appraisal values will cause the loan-to-value ratios used by Washington Mutual to establish reserves to be distorted - resulting in understated reserves for loan losses.

35.    Further, Washington Mutual's reserves for losses on loans held for sale should have been higher in light of the substantially increased risk of default and high "loan-to-value" ratios associated with loans issued pursuant to inflated appraisals.

36.    Knowing that issuing loans at such high LTVs would require the loans to be sold at a discount or held at a substantial discount to face value, Washington Mutual obtained inflated appraisals, which would result in a more favorable LTV.  In the example, if the home were appraised

at a value greater than $100,000, it would provide additional, yet illusory, collateral for Washington

Mutual to lend against.  Despite its acknowledgment of the increased risk associated with loans

secured at LTVs of greater than 80%, Washington Mutual engaged in a practice that resulted in the

issuance of loans with far less equity than stated due to the inflated appraisal values it obtained

through eAppraiseIT.  Washington Mutual assumed that the majority of loans for which it had

obtained inflated appraisals would be sold off to third party investors and that its practice of

obtaining inflated appraisals would remain undiscovered - leaving the investors on the hook for the

excessive risk of the loan.  Loans that were held in portfolio would have loan files that reflected

inflated values and auditors or others who reviewed those files would not require additional reserves.

**Washington Mutual's Relationship
With First American's eAppraiseIT**

37.    According to the First American Complaint, Washington Mutual initiated a business

relationship with eAppraiseIT on the pretense that this would create an independent appraisal

process:

> 25.    WaMu retained eAppraiseIT in Spring 2006, after WaMu decided to
> close its internal appraisal office and terminate its staff appraisers. WaMu quickly
> became eAppraiseIT's largest client, providing nearly 30 percent of its business in
> New York. Over the course of the business relationship, eAppraiseIT conducted more
> than 260,000 appraisals for WaMu, receiving over $50 million from WaMu.

> 26.    Initially, eAppraiseIT employed a combination of in-house staff and
> third-party fee appraisers, including some "preferred appraisers" identified by WaMu,
> to conduct appraisals of residential property for WaMu. eAppraiseIT also hired
> approximately 50 former WaMu employees as staff appraisers and Appraisal
> Business Managers ("ABMs") and – at WaMu's request – gave the  ABMs the
> authority to override and revise the values reached by third-party appraisers.
> One-third  of eAppraiseIT's staff appraisers are former WaMu employees, and all of
> the ABMs are former WaMu employees. eAppraiseIT's President advised the
> leadership of First American that "we have hired and on boarded many of Wamu's
> regional mangers and appraisers last week. They will be instrumental in our relational

and operational success with the sales force."

27.     Under contractual arrangements between WaMu and eAppraiseIT, WaMu can challenge an appraiser's conclusions by requesting a "reconsideration of value" ("ROV") when WaMu disagrees with an appraised home value set forth in an appraisal report. Practically speaking, this permits WaMu to ask eAppraiseIT to reconsider and raise the value assigned to a home. Throughout the business relationship, WaMu has frequently ordered ROVs from eAppraiseIT.

**False and Misleading Statements and**
**Material Omissions Made During the Class Period**

38.     On July 19, 2006, after the close of the financial markets, Washington Mutual issued

a press release to report its financial results for the second quarter of 2006, which stated as follows

in relevant part:

> Washington Mutual, Inc. (NYSE:WM) today reported second quarter 2006 net income of $767 million, or $0.79 per diluted share, including an after tax adjustment of $101 million to reflect the pending sale of $2.6 billion of mortgage servicing rights and an after tax restructuring charge of $52 million related to the company's efficiency initiatives.
>
> Net income excluding these two items would have been $920 million, or $0.94 per diluted share, compared with net income of $844 million, or $0.95 per diluted share in the second quarter of 2005.

39.     On August 9, 2006, Washington Mutual filed its quarterly report on Form 10-Q with

the SEC, which substantially incorporated the financial results released on July 19, 2006 and

disclosed that the Company's portfolio of home loans held for sale was $23.3 billion; net loans held

in portfolio included $145.7 billion of home loans and $53.0 billion in home equity loans and lines

of credit.  The Company reported reserves for loan and lease losses of $1.6 billion.

40.     The August 9, 2006 10-Q included Defendants Killinger's and Casey's certifications

under Section 302 of Sarbanes-Oxley Act, as follows:

CERTIFICATION

I, Kerry K. Killinger, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board

of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006                                   /s/ KERRY K. KILLINGER

                                                      Kerry K. Killinger
                                                      Chairman and Chief Executive Officer
                                                      of Washington Mutual, Inc.

                                        ***

                                  CERTIFICATION

I, Thomas W. Casey, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006                      /s/ THOMAS W. CASEY
                                          Thomas W. Casey
                                          Executive Vice President and Chief
                                          Financial Officer of Washington Mutual,
                                          Inc.

41.  The August 9, 2006 Form 10-Q also contained certifications by Defendants Killinger and Casey pursuant to Section 906 of the Sarbanes-Oxley Act which stated in pertinent part that each certified "that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc."

42.  Defendants' July 19, 2006 and August 9, 2006 disclosures, referenced above, were materially false and misleading because:

a.     Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.     The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.     The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.     The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

e.     Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values, financial misstatements, and substantive false statements and omission of material information.

43.     On October 18, 2006, after the close of the financial markets, Washington Mutual issued a press release to report its financial results for the third quarter of 2006, which stated as follows in relevant part:

> Washington Mutual, Inc. (NYSE: WM) today reported third quarter 2006 net income of $748 million, or $0.77 per diluted share compared with net income of $821 million, or $0.92 per diluted share, in the third quarter of 2005. Third quarter 2006 earnings included net after tax charges of $31 million, or $0.03 per diluted share, related to the previously announced sale of $2.53 billion of mortgage servicing rights, and after tax charges of $33 million, or $0.04 per diluted share, related to the company's ongoing efficiency initiatives, which are expected to continue into the fourth quarter.
> ***
> • Credit exposure continues to be proactively managed. The provision for loan and lease losses of $166 million in the third quarter reflected a slight decline in the loan portfolio and net charge-offs of $154 million.

44.     On November 9, 2006, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on October 18, 2006 and disclosed that the Company's portfolio of home loans held for sale was $23.7 billion; loans held in portfolio included $141.2 billion of home loans and $54.4 billion in home equity loans and lines of credit.  The Company reported reserves for loan and lease losses of $1.6 billion.

45.     The November 9, 2006 Form 10-Q included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

46.     Defendants' October 18, 2006 and November 9, 2006 disclosures, referenced above, were materially false and misleading because:

a.      Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.      The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.      The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.      The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

e.      Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal

values, financial misstatements, and substantive false statements and omission of material

information.

47.    On January 17, 2007 after the close of the financial markets, Washington Mutual

issued a press release to report its financial results for the fourth quarter of and full year 2006,

which stated as follows in relevant part:

> Washington Mutual, Inc. (NYSE: WM) today reported fourth quarter 2006 net
> income of $1.06 billion, or $1.10 per diluted share, compared with net income of
> $865 million, or $0.85 per diluted share, in the fourth quarter of 2005. Net income
> for 2006 was $3.56 billion, or $3.64 per diluted share, compared with net income
> of $3.43 billion, or $3.73 per diluted share, in 2005.
> ***
> Killinger noted that opportunities to grow the balance sheet at attractive
> risk-adjusted returns are limited, making the accelerated share repurchase
> transaction a superior use of capital.
>
> "Our outlook for 2007 reflects the strategic actions we took in 2006 to prepare the
> company for the future," Killinger added. "Those decisive actions have positioned
> us well to deliver stronger operating performance in 2007."
> ***
> Provision driven by credit card growth. The increase in the fourth quarter
> provision for loan and lease losses to $344 million in part reflected the growth of
> the company's on-balance sheet credit card receivables, which increased the
> provision by $95 million compared with the prior quarter.

48.    On March 1, 2007, the Company filed its annual report on Form 10-K with the

SEC, which disclosed that the Company's portfolio of home loans held for sale was $44.9

billion; loans held in portfolio included $99.5 billion of home loans, $52.9 billion in home equity

loans and lines of credit, $18.7 billion in subprime home loans, and $2 billion in subprime home

equity loans and lines of credit.  The Company reported reserves for loan and lease losses of

$1.63 billion, with $202 million attributable to home loans, $184 million attributable to home

equity loans and lines of credit and $326 million attributable to the "subprime mortgage

channel."  Washington Mutual disclosed that of the loans secured by residential property held in

portfolio, 38% had loan-to-value ratios of greater than 80%.

49. The 2006 Form 10-K stated as follows regarding loan loss reserves and contingent

credit risk liabilities (emphasis added):

**Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**
*Allowance for loan and lease losses*

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of the Company's borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable-rate loans and general economic conditions. Loans held in portfolio that are evaluated for collective impairment and loans held in portfolio that are individually reviewed for impairment but deemed not to be impaired may have both an allocated and unallocated allowance. Loans that are individually deemed to be impaired may only have an allocated allowance.

The allowance for loans evaluated for collective impairment is comprised of an allocated allowance that is computed for each portfolio based on specific loan portfolio metrics and an unallocated allowance that is computed based on certain environmental factors we believe are not adequately captured in the allocated allowance computations. Determining the adequacy of the allowance, particularly the unallocated allowance, is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance is comprised of an allowance for individually impaired loans, as well as an allowance for other individually unimpaired loans that share common risk characteristics that, in the aggregate, have incurred a probable loss on a collective basis. The determination of common risk factors that indicate a probable loss on a collective basis is complex and requires significant judgment by management about the shared risk characteristics that suggest a probable loss.

The allowance for loan and lease losses is reported within the Consolidated Statements of Financial Condition and the provision for loan and lease losses is reported within the Consolidated Statements of Income.

The estimates and judgments are described in further detail in the subsequent section of Management's Discussion and Analysis – "Credit Risk Management" and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

*Contingent Credit Risk Liabilities*

In the ordinary course of business, the Company sells loans to third parties

and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. **The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached. When a loan sold to an investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made t o the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.**

      Reserves are established for the Company's exposure to the potential repurchase or indemnification liabilities described above as such liabilities are generally recorded at fair value. Throughout the life of these repurchase or indemnification liabilities, the Company may learn of additional information that can affect the assessment of loss probability or the estimation of the amounts involved. Changes in these assessments can lead to significant changes in the recorded reserves. Repurchase and indemnification liabilities are recorded within other liabilities on the Consolidated Statements of Financial Condition, and losses are recorded on the Consolidated Statements of Income under the noninterest income caption "Revenue from sales and servicing of home mortgage loans."

      50.    The 2006 Form 10-K contained numerous disclosures concerning the use of loan-

to-value ratios in assessing credit risk, including the following statements:

Under the heading "Credit Risk Management":

      Many factors or loan attributes are used to predict and to monitor credit risk in the Company's real estate secured loan portfolios, including borrowers' debt-to-income ratios when loans are made, borrowers' credit scores, loan-to-value ratios and, with respect to residential loans, housing prices. The Company actively monitors changes in borrowers' credit scores, changes in loan-to-value ratios and housing price trends across the country. A slowdown in housing price appreciation or declines in housing prices will likely have the effect of increasing credit risk in the Company's real estate secured portfolios. The Company believes that loan-to-value ratios and credit scores are more predictive of future loan performance than are other loan factors and attributes.

              ***

      As noted above, loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance. The Company has also observed that, when comparing portfolios of prime mortgage loans and portfolios of subprime mortgage channel loans that possess comparable credit scores and loan-to-value

ratios, the subprime mortgage channel portfolios generally experience higher delinquencies and losses.

Under the heading "Features of Residential Loans":

Certain residential loans have features that may result in increased credit risk when compared with residential loans without those features. Categories of loans within the Company's portfolio that have such features include loans with an option to defer the payment of interest (i.e., Option ARM home loans), home loans where the loan-to-value ratio is greater than 80 percent, home equity loans and lines of credit where the combined loan-to-value ratio is greater than 80 percent, and interest-only payment loans. The loan-to-value ratio measures the ratio of the original loan amount to the appraised value of the collateral at origination. The combined loan-to-value ratio measures the ratio of the original loan amount of the first lien product (typically a first lien mortgage loan) and the original loan amount of the second lien product (typically a second lien home equity loan or line of credit) to the appraised value of the underlying collateral. Where the second lien product is a line of credit, the total commitment amount is used in the combined loan-to-value calculation.

Under the Section "Impact of External Risk Factors":

*Home Loans with Loan-to-Value Ratios Greater than 80 percent without Private Mortgage Insurance or Government Guarantees*

Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure. At December 31, 2006, home loans held in portfolio with these features amounted to $7.48 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent. Substantially all of these loans were made to subprime borrowers, including $5.56 billion of loans purchased from recognized subprime lenders. Total home loans with these features accounted for 16% of the Company's home loan volume in 2006. Home loans held in portfolio with loan-to-value ratios in excess of 90 percent at origination without private mortgage insurance or government guarantees amounted to $847 million, or 0.7%, of home loans held in portfolio at December 31, 2006.

***

*Home Equity Loans and Lines of Credit where the Combined Loan-to-Value Ratio is Greater than 80 percent*

Instead of undertaking cash-out refinance transactions, many borrowers elect to utilize accumulated equity in their homes by borrowing money through

either a first or second lien home equity loan or line of credit. The existence of a first lien mortgage loan and second lien home equity loan or line of credit made to one borrower and secured by the same property, most often arises when the Company:

• Originates the first lien mortgage loan and second lien home equity loan or line of credit at the same time (so called "piggyback" loans);

• Originates or purchases the first lien mortgage loan and at a subsequent date originates a second lien home equity loan or line of credit;

• Originates a second lien home equity loan or line of credit subordinate to another lender's first lien mortgage loan.

***

The balance of home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent at origination totaled $15.59 billion at December 31, 2006 and accounted for 36% of the Company's home equity volume in 2006. Substantially all of the loans and lines of credit in this portfolio had a combined loan-to-value ratio at origination of between 80 and 90 percent.

To compensate for the increased credit risk in the home equity portfolio that arises where the combined loan-to-value ratio at origination is greater than 80 percent, the Company typically charges such borrowers a higher rate of interest than would be charged if the combined loan-to-value ratio at origination was less than 80 percent. The Company also buys pool mortgage insurance that insulates it from the risk of default on those home equity loans or lines of credit where the combined loan-to-value ratio at origination is greater than 90 percent.

51.     The 2006 Form 10-K provided the following disclosure concerning the

Company's internal controls, which stated that the Company's management found the internal

controls adequate:

**Management's Report on Internal Control Over Financial Reporting**

The management of Washington Mutual, Inc. and subsidiaries (the "Company") is responsible for establishing and maintaining effective internal control over financial reporting, including safeguarding of assets. The Company's internal control structure contains monitoring mechanisms, and actions are taken to correct deficiencies identified.

There are inherent limitations in the effectiveness of any internal control, including the possibility of human error and the circumvention or overriding of controls. Accordingly, even effective internal control can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control may vary over time.

Management assessed the effectiveness of the Company's internal control over financial reporting, including safeguarding of assets as of December 31, 2006. This assessment was based on criteria for effective internal control over

financial reporting, including safeguarding of assets, described in "Internal Control – Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management believes that, as of December 31, 2006, the Company maintained effective internal control over financial reporting, including safeguarding of assets.

52.     The 2006 Form 10-K included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

53.     The 2006 10-K also incorporated the Company's Code of Ethics and Code of Conduct by reference, which it noted were available on Washington Mutual's website.  As of November 4, 2007, the Company's Code of Ethics stated as follows:

The Chief Executive Officer, President, Chief Financial Officer, Controller, and each business segment or business line president, chief financial officer and controller and persons determined to be performing similar functions (collectively, the "Senior Financial Officers") of Washington Mutual, Inc. (together with its subsidiaries and affiliates, separately or collectively, as the context may require, the "Company") have an obligation to the public, the Company, and themselves to maintain the highest standards of ethical conduct.

The Code of Ethics for Senior Financial Officers (the "Ethical Code") provides fundamental principles to which the Senior Financial Officers are expected to adhere and advocate. These principles are designed to deter wrongdoing and to promote:

Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities Exchange Commission (the "SEC") and in other public communications made by the Company; Compliance with applicable governmental laws, rules and regulations; The prompt internal reporting to an appropriate person or persons identified in the Ethical Code of violations of the Ethical Code; and Accountability for adherence to the Ethical Code.

This Ethical Code supplements the Company's Code of Conduct and reflects our Corporate Values to be Fair, Caring, Human, Dynamic,and Driven.  The Senior

Financial Officers are expected to abide by the Ethical Code as well as the Company's Code of Conduct and all other applicable Washington Mutual policies and guidelines referred to in the Company's Code of Conduct.

**Financial Reporting and Disclosure**

Senior Financial Officers will seek to promote fair, accurate, timely, and understandable disclosure in the reports and documents the company files with or submits to the SEC. The Company seeks to provide disclosure to the investment community that is not only in conformity with applicable rules of the SEC, but that also fairly presents to investors the financial condition and results of operations of the company. Senior Financial Officers shall seek to promote ethical behavior by other company officers and employees involved in financial reporting.

**Consequences of Violations**

Any violation of this Ethical Code may result in disciplinary action including, but not limited to, the following:

Disciplinary action (up to and including suspension or termination of employment);

Pursuit of any and all remedies available to the Company for any damages or harm resulting to the Company from a violation, including injunctive relief; and

Referral of matters to appropriate legal or regulatory authorities for investigation and prosecution.

**Reporting of Violations**

Any employee of the Company who becomes aware of actual or potential infractions of this Code of Ethics or who has concerns regarding questionable accounting or auditing matters involving the Company or a Senior Financial Officer should submit a report to the Audit Committee by calling 1-800-214-8771. An operator is available to take your report and direct it to the appropriate person for investigation and response. This service is confidential and anonymous.

**Requests for Waivers and Changes in Ethical Code**

Waivers of this Code of Ethics may only be granted by the Audit Committee of the Board of Directors of the Company. The Audit Committee will not grant waivers except under extraordinary circumstances. Any waivers that are granted shall be publicly disclosed on a timely basis. In addition, any changes to this Ethical Code shall be publicly disclosed on a timely basis.

**Annual Certifications**

Annually each Senior Financial Officer shall certify in writing his or her

compliance during the prior year with this Code of Ethics.

**Evaluation**

The Audit Committee shall evaluate annually the effectiveness of this Code of Ethics and recommend and adopt changes as necessary.

54.     As available on Washington Mutual's website as of November 4, 2007, the

Company's Code of Conduct stated as follows, in relevant part:

**Introduction**

Washington Mutual's Code of Conduct applies company wide. It addresses issues that concern Washington Mutual, Inc., and all of its subsidiaries (collectively, "Washington Mutual" or the "Company") and applies to the members of the Board of Directors as indicated, and to all employees, including officers, regardless of which Washington Mutual company employs them.

***

**Honesty and fair dealing**

The Company expects its employees to do their jobs with absolute honesty and integrity. The federal and state agencies that regulate many of Washington Mutual's various bank and non-bank subsidiaries require Washington Mutual to maintain a financial bond covering all affected employees. The bond does not, however, cover any employee that Washington Mutual knows has committed certain dishonest or fraudulent acts. Acts of dishonesty may result in the Company terminating the offender's employment.

**Fair dealing**

Washington Mutual strives to ensure that all of its actions are guided by absolute honesty, integrity and fairness. The Company believes that cooperation, trust and shared objectives are vital to its success. As a result, you are expected to deal fairly with Washington Mutual's customers, suppliers, competitors and employees. You may not take unfair advantage of anyone else through manipulation, concealment, abuse of confidential information, misrepresentation of material facts or other unfair business practice.

**Accuracy and completeness of Company records**

Washington Mutual has established very high standards for service and performance. As a Washington Mutual employee, you must maintain all Company records within your control completely and accurately, including time reporting records. You may not structure accounts or other corporate records so as to avoid reporting or signing authority requirements, nor may you misrepresent a transaction to make it appear more beneficial to the Company or anyone else than it really is. Washington Mutual considers falsifying or misrepresenting Company accounts and records to be the equivalent of fraud.

***

**Compliance with laws, rules and regulations**

As a financial services company, Washington Mutual operates in a highly regulated business environment. Accordingly, you are expected to understand, respect and comply with all of the laws, regulations, policies and procedures that apply to you in your position with Washington Mutual. If you have any doubt, you should talk to your manager or compliance officer, or the Company's Legal Department, to determine and understand the applicability of the laws, regulations and Company procedures and policies that apply to your position.

55.    The January 17, 2007 and March 1, 2007 statements referenced above were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.    The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

c.    Defendants' attribution of the increase in loan loss provision to Washington Mutual's credit card business created the false impression that provision and reserves on home loans were adequate;

d.    The Company's reported contingent risks and liabilities were understated as investors who purchased non-performing loans based on inflated appraisals may force Washington Mutual to repurchase such nonperforming loans resulting in undisclosed losses and liabilities;

e.    The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

f.    The Company's substantive disclosures concerning the adequacy of its internal controls were materially false and misleading in light of the intentional inflation of

appraisals by Company executives;

g.    The Company failed to disclose that its Code of Ethics and Code of
Conduct were being knowingly violated through the intentional manipulation of the appraisal
process, in violation of legal and ethical standards; and

h.    Defendants Killinger's and Casey's certifications under Sections 302 and
906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal
values, financial misstatements, and substantive false statements and omission of material
information.

56.    On April 17, 2007, after the close of the financial markets, Washington Mutual issued
a press release to report its financial results for the first quarter of 2007, which stated as follows in
relevant part:

> Washington Mutual, Inc. (NYSE:WM) reported first quarter 2007 net income of
> $784 million, or $0.86 per diluted share, compared with net income of $985 million,
> or $0.98 per diluted share, in the first quarter of 2006, a period that included an $85
> million after tax partial settlement related to Home Savings goodwill litigation.
> Based on these earnings and the company's strong financial position, the Board of
> Directors increased the cash dividend on the company's common stock for the 47th
> consecutive quarter to 55 cents per share.
>
> "Our Retail Banking, Card Services, and Commercial groups continued to post strong
> results in the first quarter as we successfully attracted a growing number of new
> customers to our expanding national banking franchise," said Kerry Killinger, the
> company's chairman and CEO. "Overall, we delivered solid results in the first quarter
> despite the challenging interest rate environment and slowing housing market."
> "Our Home Loans business was challenged during the first quarter by difficult market
> conditions," he added. "Over the past 12 months, we have taken a number of prudent
> actions to reduce our exposure to the subprime mortgage industry. These actions,
> along with a diversified business mix, limited our exposure to the mortgage market's
> downturn and position us well to expand and grow as market conditions improve."
> ***
> -- Decrease in home loan volume reflects strategic actions. The decline in home loan
> volume from the fourth quarter was the result of the proactive steps the company has
> taken to reduce its subprime exposure through this point in the cycle. Subprime

mortgage production for the first quarter was down 51 percent from the same quarter in 2006. The decline in home loan volume, year over year, also reflected the company's decision to exit its traditional correspondent business.

57.     On May 10, 2007, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on April 17, 2007 and disclosed that the Company's portfolio of home loans held for sale was $26.9 billion; loans held in portfolio included $93.5 billion of home loans, $53.4 billion in home equity loans and lines of credit, $17.6 billion in subprime home loans and $2.8 billion in subprime home equity loans and lines of credit.  The Company reported reserves for loan and lease losses of $1.5 billion.

58.     The May 10, 2007 Form 10-Q included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

59.     Defendants' April 17, 2007 and May 10, 2007 disclosures, referenced above, were materially false and misleading because:

a.     Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.      The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.     The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.     The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

e.    Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values, financial misstatements, and substantive false statements and omission of material information.

60.    On July 18, 2007, after the close of the financial markets, Washington Mutual issued a press release to report its financial results for the second quarter of 2007, which stated as follows in relevant part (emphasis added):

> WaMu (NYSE:WM) announced today that second quarter 2007 earnings per share increased 16 percent from a year ago. Continued strong performance led to net income of $830 million, or $0.92 per diluted share, compared with net income of $767 million, or $0.79 per diluted share, in the second quarter of 2006. Second quarter net income was also up from $784 million, or $0.86 per share, in the prior quarter.

> "We delivered record growth in our retail banking, credit card and commercial businesses during the second quarter. **Our Home Loans' results improved from the first quarter and we are targeting a return to profitability by the end of the year," said Chairman and CEO Kerry Killinger. "I'm pleased with the job our employees are doing in growing the franchise, delivering best-in-class customer service, as evidenced by our recent J.D. Power award recognition, and focusing on improving our operating efficiency."**

61.    On August 9, 2007, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on July 19, 2007 and disclosed that the Company's portfolio of home loans held for sale was $19.3 billion; loans held in portfolio included $88.5 billion of home loans, $55.8 billion in home equity loans and lines of credit, $17.6 billion in subprime home loans and $2.9 billion in subprime home equity loans and lines of credit.  The Company reported reserves for loan and lease losses of $1.56 billion.

62.    The August 9, 2007 Form 10-Q included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form

10-Q.

63.    Defendants' July 19, 2007 and August 9, 2007 disclosures, referenced above, were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.    The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.    The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.    The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

e.    Defendants Killinger's and Casey's certifications under Sections 302 and of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values, financial misstatements, and substantive false statements and omission of material information.

**The Market Begins to Learn the**
**Nature and Magnitude of the Wrongdoing**

64.    On October 17, 2007, after the close of the financial markets, Washington Mutual issued a press release to report its financial results for the third quarter of 2007, which stated as follows in relevant part (emphasis added):

> WaMu (NYSE:WM) announced today that third quarter 2007 net income of $210 million, or $0.23 per diluted share, compared with net income of $748 million, or $0.77 per diluted share, in the third quarter of 2006. **The company attributed the decline to a weaker housing market and disruptions in the capital markets**.
>
> "We're disappointed with our third quarter results but they reflect the increasingly difficult market conditions that are challenging the banking industry," said WaMu

Chairman and Chief Executive Officer Kerry Killinger. "Despite these challenges, our Retail Banking, Card Services and Commercial businesses delivered good operating performance during the quarter, **and we continued to adapt our Home Loans business to meet market conditions.**" Killinger added that the company remains focused on executing its long-term growth plans.

***

-- Increase in provision reflects further weakness in the housing market. The quarter's provision increased to $967 million from $372 million in the prior quarter in response to higher delinquencies and impacts from recent house price trends, as well as the $22.1 billion, or 10 percent, growth in the company's loan portfolio during the quarter. The increase in the non-card portion of the provision to $644 million from $143 million in the second quarter was driven by further weakening in the housing market, primarily as it affects subprime and home equity loans.

-- The company also increased the provision for loan losses for credit cards to $323 million from $229 million in the second quarter reflecting a higher level of delinquencies and a lower level of anticipated recoveries.

65.     During the Company's October 17, 2007 conference call with investors, Defendant Casey disclosed that Washington Mutual's "allowance for loan and lease losses [was] $1.9 billion at quarter end, up 21 percent from the end of the second quarter."

66.     With respect to the outlook for the balance of the year, during the October 17, 2007 conference call Defendant Casey stated as follows:

As we consider our credit provisioning outlook for the remainder of the year, let me just say that I have never seen housing credit conditions change so significantly over such a short period of time. Nor can I remember a period when there was less clarity about near-term housing and credit trends.

As I discussed in detail earlier, we have seen a sharp deterioration in the housing market since our second quarter earnings call and a further acceleration of adverse trends in our portfolio since we updated our guidance last in September. The guidance I provide you today is based on our best thinking given the facts that are currently available. However, we expect the market will continue to change quickly.

The main drivers of our credit provision are the level of delinquencies and charge-offs in our portfolio, both of which rose sharply in the third quarter as home prices declined in many of our major markets. Based on our current view of the macro environment for housing and our own portfolio data, we expect delinquencies

and charge-offs in our portfolio to increase further during the fourth quarter.

Considering the weakening housing market and adverse trends in the third quarter, our best estimate at this time is that charge-offs in our portfolio will increase between 20 and 40 percent in the fourth quarter and that our total 2007 provision will be between $2.7 and $2.9 billion.

67.    Defendants' October 17, 2007 disclosures, referenced above, were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.    The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.    The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.    The Company's statements regarding loan loss reserves and provision for credit losses failed to disclose that a material portion of such asset impairments was related to loans issued based on inflated appraisals;

e.    The Company's disclosures concerning anticipated asset writedowns to be taken during the fourth quarter reflect that past asset balances were overstated due to the improper use of inflated appraisals; and

f.    The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated.

68.    Despite Defendants' continuing failure to disclose the improprieties related to Washington Mutual's manipulation of the home mortgage market, the market did begin to realize that there was a significant deterioration in Washington Mutual's balance sheet and home loan

business that was not entirely attributable to those reasons provided by the Company. This decline was noted in an October 31, 2007 commentary by Jonathan Weil of Bloomberg:

Oct. 31 (Bloomberg) -- If you think the worst is over for mortgage lenders, a close look at Washington Mutual Inc.'s balance sheet should dispel that notion pretty quickly.

The largest U.S. savings and loan stunned investors on Oct. 17 when it said it would set aside as much as $1.3 billion this quarter to cover anticipated loan losses. The news came the same day Washington Mutual announced a 72 percent drop in third-quarter net income to $210 million.

Since then, Washington Mutual's stock has fallen 15 percent. And at $28.11, the Seattle-based thrift now trades for only slightly more than its book value, or assets minus liabilities, while its dividend yield is a whopping 8 percent.

The signal from the market: Washington Mutual's dividend and book value aren't sustainable -- and with good reason.

Washington Mutual has paid more than $1.9 billion in cash dividends over the past year, including $485 million last quarter. Meanwhile, the real wonder is that Washington Mutual's forecast for fourth-quarter loan-loss provisions wasn't substantially higher.

First, a brief accounting primer: Loan-loss allowances are the reserves that lenders set up on their balance sheets in anticipation of bad loans. Provisions are the expenses lenders record to boost their loan-loss allowances. As loans are written off, lenders record charge-offs, reducing their allowances.

For the third quarter, Washington Mutual recorded $967 million in loan-loss provisions and $421 million in net charge-offs. Those and other actions brought the company's loan-loss allowance to $1.89 billion at Sept. 30, up from $1.56 billion at June 30.

Looks Light

As for the fourth quarter, Washington Mutual predicted that provisions would be $1.1 billion to $1.3 billion and that charge-offs would increase 20 percent to 40 percent.

To see why even $1.3 billion in provisions looks light, consider Washington Mutual's $57.86 billion of so-called option- ARM loans, which make up 24 percent of Washington Mutual's loan portfolio. These adjustable-rate mortgages were popular during the housing bubble, because they give customers the option of postponing interest payments, which the lender then adds to their principal balances.

As of Sept. 30, the unpaid principal balance on Washington Mutual's option ARMs exceeded the loans' original principal amount by $1.5 billion, meaning the customers owed $1.5 billion more in principal than what they originally borrowed. By comparison, that figure was $681 million a year earlier, when Washington Mutual had $67.14 billion, or 16 percent more, option ARMs on its books.

Look to the end of 2005, and the trend becomes even starker. Back then, Washington Mutual had even more option ARMs on its balance sheet, at $71.2 billion. Yet the unpaid principal balance exceeded the original principal amount by only $160 million -- and that was up from a mere $11 million at the end of 2004.

Deferring Pain

The deferred interest from option ARMs also boosts Washington Mutual's earnings, part of a process known as negative amortization, or ``neg-am.'' That's because option-ARM lenders recognize interest income when customers postpone their interest payments, even though the lenders got no cash.

For the nine months ended Sept. 30, Washington Mutual recognized $1.05 billion in earnings as a result of neg-am within its option-ARM portfolio. That represented 7.2 percent of Washington Mutual's $14.61 billion of total interest income year-to-date. By comparison, neg-am contributed 1.8 percent of Washington Mutual's interest income for all of 2005 and just 0.2 percent for 2004.

What's going on here? Either the borrowers postponing their interest payments are doing so as a matter of choice, by and large, or they can't afford to pay them. Common sense suggests it's the latter -- and that there's serious doubt Washington Mutual ever will collect the $1.5 billion of postponed interest that its option-ARM customers have added to their original principal balances.

No Questions

Yet the $1.1 billion to $1.3 billion of fourth-quarter provisions that Washington Mutual predicted -- for the company as a whole -- wouldn't even cover the $1.5 billion of tacked-on principal. The trend among Washington Mutual's option ARMs shows no sign of slowing, either.

Through a spokeswoman, Libby Hutchinson, Washington Mutual officials declined to comment. She said the company's executives aren't fielding questions until their next meeting with investors on Nov. 7.

Then there's the bigger picture. While Washington Mutual's loan-loss allowance rose 22 percent to $1.89 billion during the 12 months ended Sept. 30, nonperforming assets rose 128 percent to $5.45 billion. So even if Washington Mutual adds $1.3 billion in provisions next quarter, its loan-loss allowance still won't be anywhere close to catching up.

To be sure, Washington Mutual executives have some latitude over the timing of the company's loan-loss provisions. Yet they also may have a monetary incentive to push losses into 2008.

Under the formula Washington Mutual's compensation committee will use to determine executive bonuses this year, 40 percent is weighted toward 2007 earnings-per-share targets, according to the company's latest proxy. Goals related to non-interest expense and non-interest income each count for 25 percent, while ``customer loyalty'' goals count for 10 percent.

Postponed Reckoning

The proxy didn't disclose the specific goals for those performance measures. Still, it stands to reason that Washington Mutual executives would come closer to hitting the EPS goal if they minimize loan losses this year.

On its Web site, Washington Mutual says the reason it no longer provides EPS forecasts to the public is that ``many believe EPS guidance tends to focus management on near-term rather than long-term performance.''

The same, of course, is true for executive bonuses that are tied heavily to yearly EPS targets. If Washington Mutual's management is more focused on near-term performance now, as the numbers suggest, this might help explain it.

69.    As noted in this article, on October 18, 2007, following Washington Mutual's October 17, 2007 announcement of third quarter results and disclosure of additional anticipated asset writedowns, the stock declined by $2.55, or 7.8%, from its October 17, 2007 closing price of $33.07 per share.  This decline continued through October 31, 2007 when Washington Mutual shares closed at $27.88 each, down a total of $5.19 per share, or 15.7%, since the release of third quarter financial results.

**The First American Complaint Provides Further**
**Information About Defendants' Fraudulent Scheme**

70.    As detailed above at length, on November 1, 2007 New York Attorney General Andrew Cuomo filed the First American Complaint which alleges a complex scheme undertaken by senior Washington Mutual executives to manipulate the value of appraisals provided by eAppraiseIT.

71.    The degree of pressure exerted by Washington Mutual executives demonstrated by these allegations illustrates that this was not an isolated incident, but a systematic manipulation by of the appraisal process by Defendants.  This scheme caused the overstatement of assets subsequently written down by Washington Mutual during the third quarter of 2007, anticipated future writedowns during the fourth quarter of 2007 and other false statements, as

alleged above, during the Class Period.

72.    The allegations in the First American Complaint partially revealed to the market the fraudulent scheme undertaken by Defendants.  After absorbing this news, shares of the Company's stock sank on November 1, 2007 and November 2, 2007, closing at $23.81 on November 2, 2007, down $4.07 per share, or 15%, from the $27.88  per share closing price on October 31, 2007.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a Class Action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of the publicly traded securities of Washington Mutual between July 19, 2006 and October 31, 2007. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

74.    At all relevant times, the market for Washington Mutual securities was an efficient market for the following reasons, among others:

a.    Washington Mutual securities met the requirements for listing, and were listed, on the New York Stock Exchange ("NYSE"), an efficient and automated market;

b.    During the Class Period, millions of shares of Washington Mutual securities were traded on the open market;

c.    As a regulated issuer, Washington Mutual filed periodic public reports with the SEC and the NYSE; and

d.    Washington Mutual was followed by numerous securities analysts

employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

75.     As a result, the market for Washington Mutual securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Washington Mutual's Share price. Under these circumstances, all purchasers of the Company's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

76.     This action is properly maintainable as a class action because:

a.     The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. Throughout the Class Period, Washington Mutual securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class;

b.     Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and the members of the Class purchased Washington Mutual shares and sustained damages as a result of the defendants' wrongful conduct complained of herein;

c.     Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

d.     A class action is superior to other available methods for the fair and

efficient adjudication of the claims asserted herein. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

e.       The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

i.       whether the federal securities laws were violated by defendants' acts as alleged herein;

ii.       whether statements disseminated to the investing public and to Washington Mutual's shareholders during the Class Period misrepresented material facts about the operating results and financial condition of the Company;

iii.       whether defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting to state material facts;

iv.       whether, during the Class Period, the market price of Washington Mutual securities was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

v.       whether the defendants participated in and pursued the common course of conduct complained of herein; and

vi.       whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

77.       Plaintiff anticipates no unusual difficulties in the management of this action as a

class action.

## NO SAFE HARBOR/ADDITIONAL SCIENTER ALLEGATIONS

78.    As alleged herein, the Defendants acted with scienter because at the time that they

issued public documents and other statements in Washington Mutual's name, they knew or

recklessly disregarded the fact that such statements were materially false and misleading, or

omitted to disclose material facts.  Moreover, the Defendants knew such documents and

statements would be issued or disseminated to the investing public, knew that persons were

likely to rely upon those misrepresentations and omissions, and knowingly and recklessly

participated in the issuance and dissemination of such statements and documents as primary

violators of the federal securities laws.

79.    As set forth in detail throughout the Complaint, the Defendants, by virtue of their

control over, and/or receipt of Washington Mutual's materially misleading statements, and their

positions with the Company which made them privy to confidential proprietary information

concerning Washington Mutual' s improper appraisal practices, and used such information to

artificially inflate Washington Mutual financial results.  The Defendants created, were informed

of, participated in, and knew of, the scheme alleged herein to distort and suppress material

information pertaining Washington Mutual's improper manipulation of appraisals.  With respect

to non-forward looking statements and omissions, the Defendants knew and recklessly

disregarded the falsity and misleading nature of that information, which they caused to be

disseminated to the investing public.  The statutory safe harbor provided for forward-looking

statements under certain circumstances does not apply to any of the false statements pleaded in

this Complaint. None of the statements pleaded herein are "forward-looking" statements and no

such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

80.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Washington Mutual who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER

81.    Plaintiff repeats and realleges each and every allegation above, as if set forth in

full herein.

82.    Throughout the Class Period, defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Washington Mutual securities.

83.    The purpose and effect of defendants' plan, scheme and course of conduct were to artificially inflate the price of Washington Mutual's securities and to artificially maintain the market price of Washington Mutual securities.

84.    The Individual Defendants, who were the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Washington Mutual personnel to members of the investing public, including Plaintiff and the Class, and the securities analysts.

85.    As a result of the foregoing, the market price of Washington Mutual securities was artificially inflated during the Class Period.  In ignorance of the falsity of the defendants' statements concerning the operating results and performance of Washington Mutual, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or

the integrity of the market price of Washington Mutual securities during the Class Period in purchasing Washington Mutual securities at prices which were artificially inflated as a result of defendants' false and misleading statements.

86.    Had Plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Washington Mutual securities at the artificially inflated prices that they did.

87.    Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased Washington Mutual securities in ignorance of the financial risk to them as a result of such nondisclosures.

88.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

89.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Washington Mutual, their control over, and/or receipt and/or modification of Washington Mutual' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Washington Mutual, participated in the fraudulent scheme alleged herein.

90.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the defendants had actual knowledge that the particular forward-looking statement was false.

91.     The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

92.     By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder, and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Washington Mutual securities during the Class Period.

## COUNT II

## AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(A) FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT

93.     Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

94.    During the Class Period, each of the Individual Defendants, by virtue their offices at, and directorship of Washington Mutual and their specific acts, was a controlling person of Washington Mutual within the meaning of Section 20(a) of the Exchange Act.

95.    Each Individual Defendant's positions made him privy to, and provided him with actual knowledge of, the material facts which the Individual Defendants and Washington Mutual concealed from Plaintiff and the other members of the Class during the Class Period.

96.    Each of the Individual Defendants had the power and influence, and exercised same, to engage in the unlawful conduct and practices complained of herein by causing Washington Mutual to disseminate the false and misleading information referred to above.

97.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

98.    By virtue of the conduct alleged above, the Individual Defendants are liable to the Plaintiff and the other members of the Class for the substantial damages that they suffered in connection with their purchases of Washington Mutual's securities during the Class Period.

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the defendants as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

C.    Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all defendants, jointly and severally, in favor

of Plaintiff and the other members of the Class for all losses and damages suffered as a result of

the acts and transactions complained of herein, together with prejudgment interest from the date

of the wrongs to the date of the judgment herein;

      E.      Awarding Plaintiff the costs, expenses, and disbursements incurred in this action,

including reasonable attorneys' and experts' fees; and

      F.      Awarding Plaintiff and the other members of the Class such other and further

relief as the Court may deem just and proper in light of all the circumstances of this case.

### JURY DEMAND

      Plaintiff demands a trial by jury.


Dated: New York, New York
       November 5, 2007

By: _____

**WOLF POPPER LLP**

Robert C. Finkel (RF 2373)
James A. Harrod (JH 4400)
845 Third Avenue
New York, NY 10022
Tel.: 212.759.4600
Fax : 212.486.2093

Attorneys for Plaintiff

## PLAINTIFF CERTIFICATION

I, Dennis Koesterer, hereby state:

1.      I have reviewed the draft complaint against Washington Mutual, Inc. ("WaMu"), and certain of its senior officers and directors, entitled Koesterer v. Washington Mutual, Inc., et al., and have authorized the filing of the complaint and/or a lead plaintiff motion on my behalf by Wolf Popper LLP.

2.      I did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period alleged in the Complaint, I made the following transactions in WaMu common stock:

| Transaction (Buy, Sell, etc.) | Trade Date | No. of Shares | Price Per Share |
|---|---|---|---|
| Buy | 9/29/06 | 400 | $43.54 |
| Buy | 10/19/07 | 200 | $30.00 |
| Buy | 10/25/07 | 200 | $27.32 |

5.      During the three-year period preceding the date of my signing this certification, I have filed a complaint as a representative on behalf of a class in the following private action(s) arising under the federal securities laws (if none, state "none"):

Koesterer v. BigBand Networks, Inc., et. al., 07 Civ. 5168 (N.D. Cal.)

I have not sought to serve as a lead plaintiff in any action under the federal securities laws in the past three years.

6.      I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of November 2007.

Dennis Koesterer
SIGNATURE