Judge McMahon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 9801

| | |
|---|---|
| DENNIS KOESTERER, on behalf of himself and all others similarly situated, | Civil Action No.: |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | |
| WASHINGTON MUTUAL, INC., KERRY K. KILLINGER, DAVID C. SCHNEIDER and THOMAS W. CASEY, | JURY TRIAL DEMANDED |
| Defendants. | |

NOV 0 6 2007

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Dennis Koesterer ("Plaintiff"), alleges the following based upon the

investigation of Plaintiff's counsel, which included, among other things, a review of the

defendants' public documents, conference calls and announcements made by defendants, United

States Securities and Exchange Commission (the "SEC") filings, wire and press releases

published by and regarding Washington Mutual, Inc. ("Washington Mutual" or the "Company"),

securities analysts' reports and advisories about the Company, the complaint filed by the

Attorney General of the State of New York against the First American Corporation and

information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought by Plaintiff on behalf of all

purchasers of the publicly traded securities of Washington Mutual between July 19, 2006 and

October 31, 2007 (the "Class Period"). The complaint seeks to pursue remedies under the

Securities Exchange Act of 1934 (the "Exchange Act").

2.      Washington Mutual is the nation's largest savings and loan. The Company is incorporated in Washington, and headquartered in Seattle, Washington, with well over twenty bank branches and "home loan" centers in this District.

3.      On November 1, 2007, the Attorney General of the State of New York filed a lawsuit against First American Corporation ("First American") and First American's real estate appraisal subsidiary, eAppraiseIT (the "First American Complaint"). Washington Mutual is eAppraiseIT's largest customer and it provides real estate appraisal services to Washington Mutual on mortgages and "second lien" home loans, such as home equity loans and home equity lines of credit. According to allegations against First American, during the Class Period, Washington Mutual used only two outside appraisal firms, eAppraiseIT and Lender's Service, Inc. The First American Complaint alleges that beginning in 2006, eAppraiseIT provided over 260,000 appraisals for Washington Mutual.

4.      Andrew Cuomo, the New York Attorney General, alleges in the complaint that beginning in "Summer 2006" Washington Mutual put pressure on eAppraiseIT to increase the appraised value of homes:

> First American and eAppraiseIT have abdicated their role in providing
> "third-party, unbiased valuations" for eAppraiseIT's largest client, WaMu.
> Instead, eAppraiseIT improperly allows WaMu's loan production staff to
> hand-pick appraisers who bring in appraisal values high enough to permit
> WaMu's loans to close, and improperly permits WaMu to pressure eAppraiseIT
> appraisers to change appraisal values that are too low to permit loans to close.
> eAppraiseIT compromises its independence even while publicly touting that
> independence, and despite myriad warnings from its senior management team
> about the illegal collusion inherent in the compromises it is making. Instead of
> preserving its independence, which would have protected consumers and business
> customers alike, eAppraiseIT chose to protect only itself. And senior executives at
> First American, though warned by eAppraiseIT's senior management of its
> compromised independence, nonetheless directed eAppraiseIT to continue its

wrongful conduct.

5.     Throughout the Class Period, however, Defendants failed to disclose the undue and improper pressure placed on First American by Washington Mutual executives in attempt to obtain higher appraisal values. As stated in the First American Complaint such inflated appraisals create an enhanced risk of "loss of value in a foreclosure proceeding."

6.     Defendants' improper appraisal practices during the Class Period (1) rendered the Company's statements about its compliance with ethical and legal guidelines materially false and misleading; (2) rendered defendants' statements about the adequacy of the Company's internal controls materially false and misleading; (3) were not disclosed and thus constitute an ongoing omission of material fact related to the Company's core home loan business; (4) caused certain of the Company's reported financial information, including assets associated with home loans held in portfolio or held for sale and income from home loans sold to third parties, to be materially overstated throughout the Class Period; (4) caused the Company's loan loss reserves, provisions for doubtful account and contingent liabilities to be materially understated during the Class Period; and (5) caused Defendants to report financial results that were in violation of GAAP.

7.     On October 17, 2007, after the close of the financial markets, Washington Mutual announced its results for the third quarter of 2007 and during a conference call to discuss those results revealed that its anticipated fourth quarter 2007 writedowns of home loan assets would be $1.3 billion greater than previously disclosed. These writedowns were caused, at least in part, by the impairment of loan assets that were originated based on inflated appraisals. Over the ten trading days following this announcement, Washington Mutual's stock price decline by $5.19 per share, or 15.6%, from its $33.07 closing price on October 17, 2007.

8.    On November 1, 2007, following the announcement of the First American Complaint, Washington Mutual shares fell further over the next two trading days, closing at $23.81 on November 2, 2007, down $4.07 per share, or 15%, from the $27.88 per share closing price on October 31, 2007.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rule 10b-5 promulgated thereunder 17 C.F.R. § 240.10b-5.

10.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

11.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Certain of the acts and transactions alleged herein occurred in substantial part in this Judicial District, Washington Mutual has a substantial presence in this judicial district and the First American Complaint was filed in this judicial district in the Supreme Court of the State of New York, County of New York.

12.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

13.    As set forth in the attached Certification, Plaintiff purchased Washington Mutual securities during the Class Period at artificially inflated prices and was damaged thereby.

Doc. 158816

4

14.    Defendant Washington Mutual is a Washington corporation, with its principal place of business located at 1301 Second Avenue, Seattle, Washington, 98101. In its Form 10-K for fiscal 2006, the Company acknowledged that it was subject to regulation by the Office of Thrift Supervision, among other state and federal authorities:

> As a savings and loan holding company, Washington Mutual, Inc. is subject to regulation by the Office of Thrift Supervision (the "OTS"). The Company's banking subsidiaries are subject to regulation and examination by the OTS (their primary federal regulator) as well as the Federal Deposit Insurance Corporation ("FDIC"). Its nonbank financial subsidiaries are also subject to various federal and state laws and regulations.

15.    Defendant Kerry K. Killinger ("Killinger") is, and was at all times relevant hereto, the Chief Executive Officer and Chairman of WaMu's Board.

16.    Defendant Thomas W. Casey ("Casey") is, and was at all times relevant hereto, Executive Vice President, Chief Financial Officer and a member of the Executive Committee of WaMu. Casey oversees all aspects of Washington Mutual's corporate finance, strategic planning and investor relations functions.

17.    Defendant David C. Schneider ("Schneider") is, and was at all times relevant hereto, Executive Vice President and President, Home Loans and a member of the Executive Committee. Schneider oversees all aspects of the Company's home loans business including prime mortgage lending, subprime mortgage lending, mortgage banker finance, and specialty mortgage finance.

18.    Defendants Killinger, Casey and Schneider are collectively referred to hereinafter as the Individual Defendants. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Washington Mutual's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and

institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to or shortly after their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their positions and access to material non-public information available to them, each of

these defendants knew that the adverse facts specified herein had not been disclosed to and were

being concealed from the public and that the positive representations which were being made were

then materially false and misleading. The Individual Defendants are liable for the false statements

pleaded herein, as those statements were each "group published" information, the result of the

collective actions of the Individual Defendants and should also be deemed "control persons" of the

Company.

## SUBSTANTIVE ALLEGATIONS

### Background - Home Loan Industry and the Role of Appraisers

19.    The First American Complaint provides as background the following description of

the structure of the home lending business and the reasons why banks that originate mortgages no

longer have an incentive to ensure that home loans are predicated upon fair and accurate appraisals

(emphasis added):

> 12.    Most people interested in purchasing or refinancing a home
> ("borrowers") seek a financial institution (a "lender") to lend them money on the
> most favorable repayment terms available. Traditionally the lender, as part of
> agreeing to loan the funds, wanted to ensure that the borrower was able to repay the
> loan and that the loan was adequately collateralized in case the borrower defaulted.
> The borrower and the lender had a common interest in accurately valuing the
> underlying collateral because both wanted to be sure the borrower was not paying too
> much for the property and would be able to meet the repayment terms, or that – in the
> event of default and foreclosure – the property value could support the loan.
>
> 13.    Today, the landscape of the mortgage industry is quite different from

this traditional model. Rather than holding the mortgage loans, lenders now regularly sell these mortgages in the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, securitized, and sold to the general public as mortgage backed securities. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and aiding its stock price. Today, the vast majority of mortgage loans are sold to investment banks or GSEs, leaving the original lender holding far fewer mortgages in its portfolio.

       14.    This reconfiguration of the way that mortgages are held has transformed the incentives in the industry. **Specifically, it has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans. Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest in ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lenders' profits are determined by the quantity of loans they successfully close, and not the quality of those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow the loan to close, whether or not the appraisal accurately reflects the home value.**

       20.    The First American Complaint states as follows concerning the legal requirements

enacted to ensure independent appraisals of real estate:

       18.    Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent. The Uniform Standards of Professional Appraisal Practice ("USPAP") are incorporated into federal and New York law. See 12 C.F.R. § 34.44; 19 NYCRR § 1106.1. USPAP requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).

       19.    Federal law sets independence standards for appraisers involved in federally regulated transactions. See 12 U.S.C. §§ 3331, *et seq*. The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states

that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

20.    In 2005, federal regulators including the OTS [Office of Thrift Supervision] published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." With regard to appraisal independence, the document provides:

3.    Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?

Answer:    The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff. Loan production staff should not select appraisers.

\* \* \*

5.    When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided the list is not under their control?

Answer:    Yes, loan production staff may use a revolving, board approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. Staff responsible for the development and maintenance of the list should be independent of the loan production process. . . . Further, there should be periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that controls exist to ensure independence.

21.    Generally, USPAP and the federal laws and regulations which incorporate the provisions set forth above, preclude lenders from exerting influence over the appraisal process or appraisal value.

Doc. 158816                                         8

**Washington Mutual's Improper Manipulation
of eAppraiseIT to Obtain Infalted Appraisals**

22.     The First American Complaint alleges a complex scheme undertaken by senior

Washington Mutual executives to manipulate the value of appraisals provided by eAppraiseIT. The

relevant allegations are excerpted as follows:

> 28.     By email dated September 29, 2006, a WaMu executive wrote to
> eAppraiseIT's senior executives to define the responsibilities of eAppraiseIT's
> ABMs as to ROVs and value disputes:
>
> > . . . the four appraisers/reviewers would be directly involved in
> > escalations dealing with: ROVs, Valuation issues where the purchase
> > price and appraised value differ with no reconciliations/justifications
> > by the appraiser, Value cuts which we continue to receive from your
> > third party reviewers (Wholesale), proactively making a decision to
> > override and correct the third party appraiser's value or reviewer's
> > value cut, when considered appropriate and supported . . ..
>
> In this way, from the outset, WaMu sought to use eAppraiseIT to ensure that
> appraisals did not come in lower than WaMu wanted.
>
> ***
>
> 29.     Almost immediately after WaMu retained eAppraiseIT to provide
> appraisals in early Summer 2006, WaMu's loan production staff began complaining
> that the appraisal values provided by eAppraiseIT's appraisers were too low. It was
> clear, and eAppraiseIT well understood, that WaMu's dissatisfaction was largely due
> to the fact that eAppraiseIT's staff and fee appraisers were not "hitting value," that
> is, were appraising homes at a value too low to permit loans to close.
>
> ***
>
> 31.     A week later, on August 15, 2006, eAppraiseIT's Executive Vice
> President advised eAppraiseIT's President that WaMu's loan officers would often
> pressure WaMu's internal appraisal field managers for an "extra few thousand," or
> "tell[] them specifically what they needed," or would "ask for several ROVs on the
> same property." eAppraiseIT's Executive Vice President explained that "[h]aving
> loan officers ask for a few thousand dollars because it is within the range is
> something we do not currently do for any client. . . . It is also direct pressure on the
> appraiser for a higher value without any additional information."
>
> ***
>
> 34.     During this period, First American was seeking additional business
> from WaMu in other areas. But WaMu expressly conditioned giving any future
> business to First American on success with eAppraiseIT. By email dated September

27, 2006, a First American senior executive advised other senior executives at First American and eAppraiseIT about a conversation he had with the President of WaMu Mortgage about long-term business prospects.

The First American executive explained that:

> [WaMu] and I discussed our long-term relationship including the money we have on deposit there and our other current business relationships. I told him we would like to expand those relationships. And in exact terms, we would like one half of their flood business, which they currently give 100% to [Corporation A] and their tax business is divided 3 ways among [3 corporations] and that we would like to take [Corporation A's] tax business.

According to the First American executive, WaMu responded as follows:

> He said that if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship including tax and flood.
>
> ***

37.    In February 2007, WaMu directed eAppraiseIT to stop using its usual panels of staff and fee appraisers to perform WaMu appraisals. Instead, WaMu's loan origination staff demanded that eAppraiseIT use a Proven Panel of appraisers selected by the loan origination staff, who were chosen because they provided high values.

38.    By email dated February 22, 2007, eAppraiseIT's President explained to senior executives at First American WaMu's motives for demanding the Proven Panel:

> We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's "Proven Appraisers". . . . We will pay their appraisers whatever they demand. Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV. (Emphasis added).
>
> ***

41.    In February 2007, eAppraiseIT simply capitulated to WaMu's demands. In an email on February 22, 2007, eAppraiseIT's President told senior executives at First American "we have agreed to roll over and just do it." He explained that "we were willing to live with the change if they would back us up with the appraisers and tell them that simply because they are rated as Gold Preferred does

not mean that they can grab all the fees. They agreed." In other words, for the right price in fees, eAppraiseIT was willing to go along with the Proven Panel.

\*\*\*

43.    On March 5, 2007, WaMu confirmed the primary role of its loan origination staff in picking appraisers in a follow-up email, in which it explained that the Proven Appraiser List is being created. This will replace the WaMu preferred list. The initial list of names will be provided by lending with a minimum of two appraisers per area/county. The list will then be reviewed and approved by the Appraisal Business Oversight Team and will be checked against our most recent ineligible list. Final list will be provided to VMC's [vendor management companies]. Majority of work must be assigned to the appraisers on the Proven Appraiser List on a Priority Basis. (Emphasis added).

\*\*\*

48.    On April 17, 2007, eAppraiseIT's President wrote to senior executives at First American, describing the issues with WaMu as follows:

> In short, the issues are using their designated appraisers as mandated by the WaMu production force at 20% gross margin and bypassing our panel. **We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation.** (Emphasis added).

\*\*\*

57.    On May 11, 2007, eAppraiseIT's Executive Vice President wrote to eAppraiseIT's President that "currently WAMU is controlling the appraiser panel. They are selecting the appraisers and calling them 'proven' appraisers. These appraisers are being chosen by their sales force. First American eAppraiseIT (FA eAppraiseIT) is obligated to use these appraisers." According to eAppraiseIT's Executive Vice President, WaMu was using a Proven Panel because of the "low values" from eAppraiseIT's appraisers.

\*\*\*

71.    In one specific example, in or about December 2006, a particular appraiser ("Appraiser A") was approved to be an appraiser on the Proven Panel. From January 25, 2007 through May 7, 2007, Appraiser A conducted five appraisals for eAppraiseIT with respect to WaMu properties. For each appraisal, WaMu requested a reconsideration of value. In each instance, Appraiser A refused to increase the value.

72.    Shortly thereafter, Appraiser A was removed from the Proven List and placed on the WaMu inactive list. He was then told by a WaMu sales assistant that he was removed from the panel because he did not increase values in response to these reconsiderations of value. This same WaMu sales assistant told Appraiser A that many appraisers who had previously been removed from WaMu's list of active appraisers for conducting fraudulent appraisals were being reinstated on WaMu's Proven List in order to help ensure that appraisals would come in at sufficiently high

value to permit the loans to close.

73.    On May 30, 2007, Appraiser A wrote to eAppraiseIT regarding the WaMu Proven Panel.    In the email, Appraiser A wrote that: "We continued to provide this high level of service when eAppraiseIT took over as appraisal management. With no explanation or warning, I was removed from the assignment rotation in mid April of this year. I respectfully ask to be reinstated as an active preferred appraiser."

74.    Following receipt of Appraiser A's email, on May 30, 2007, an eAppraiseIT Appraisal Specialist wrote to eAppraiseIT's Executive Vice President, Chief Operating Officer and Chief Appraiser:

> I was working with two good, solid long-time wonderful appraisers in NY and CT until right after the WaMu Proven Panel was formed. They were both removed very soon after for no apparent reason. We were having value issues, however, I felt their work was very defendable and supportable, and kept copious notes on our dealings. They have continued to keep in touch with me, in order to find out why they were removed from the panel. (Emphasis added).

75.    On May 31, 2007, eAppraiseIT's Chief Appraiser replied:

> First he was on the Master List so put on WAMU Proven and then as the list went around he was REMOVED. The probability that a loan officer requested him to be removed is pretty high I think because that is what they did with the Master List; they sent it out to Lending to choose.

76.    To date, Appraiser A remains off the Proven Panel.

                              ***

81.    Similarly, on April 17, 2007, a third appraiser ("Appraiser C") wrote to eAppraiseIT that:

> This is the second Wamu Appraisal quality assurance issue I have received from Wamu in the past 2 months. Both as a result of an appraisal I completed that did not come in to their predetermined value for a "valued" Wamu client. I was pressured for 2 weeks to change both my value and the conditions of my appraisal report . . . both of which were violations of USPAP, FANNIE MAE and the Supplemental Standards I am required to observe and am bound by my license to complete. Since that time, I have been singled out by WaMu and have been pressured on every appraisal I have completed

that did not reach a pre-determined value. I feel that Wamu is in process of "blacklisting" me as an approved Wamu appraiser by going after each appraisal I complete and looking for violations." (Emphasis added).

82.    Appraiser C wrote this email after having been pressured and harassed to increase values on two appraisals, after WaMu had requested ROVs and she had declined to increase the values. Shortly after her refusal to increase these values, she received two "Unacceptable Appraisal Notifications" from WaMu. After having been harassed and targeted with "unacceptable" strikes, she withdrew from WaMu's panel in order to avoid being removed against her will.

\*\*\*

86.    Further, email exchanges between WaMu and eAppraiseIT show that WaMu repeatedly pushed eAppraiseIT's ABMs to increase appraised values so that loans could close. For example, in one exchange with an eAppraiseIT review appraiser, a WaMu loan officer wrote that "Basically, if we don't get at least the appraised value of $3,650,000 . . . we lose the deal." (Ellipses in original). Earlier that day, this loan officer told eAppraiseIT that "if we don't have a definitive $$ appraised value then the borrower will go to another lender with a higher appraised value of $4mm. Please . . . at least . . . keep this value at the original appraised value of $3,650,000." (Ellipses in original).

87.    On May 23, 2007, eAppraiseIT's Chief Appraiser described these comments as "a clear picture of Lender Pressure on behalf of WaMu."

88.    eAppraiseIT received other communications from WaMu in which WaMu attempted to influence the appraised values of specific properties. For example, on May 24, 2007, eAppraiseIT's Chief Operating Officer wrote to eAppraiseIT's President that: "We have received in the past, and now most recently with the Sag Harbor event (which incidentally just happens to be a New York property), communications where it could be viewed that EA did experience some level of influence to increase a value beyond that which we concluded in our own analysis was not supported."

89.    eAppraiseIT's internal appraisal log entries indicate that its Review Appraisers and ABMs increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close. For the period of November 2006 to May 2007, there were 8 desk reviews performed by ABMs and 1 desk review performed by the Appraisal Specialist relating to properties in New York, all of which were for WaMu. The appraised values were increased in each of the 9 desk reviews completed, as follows: from $825,000 to $850,000, $230,000 to $240,000, $415,000 to $420,000, $1,550,000 to $2,270,000, $720,000 to $730,000, $535,000 to $556,000, $580,000 to $587,000, $500,000 to $525,000.

90. This level of contact between WaMu's loan production staff and eAppraiseIT's ABMs is prohibited by USPAP's independence requirements and by state and federal law.

**Washington Mutual's Business
and Use of Inflated Appraisals**

23. In its Annual Report for 2006 on Form 10-K, filed with the SEC on March 1, 2007, Washington Mutual describes its business as follows:

> The Company has four operating segments for the purpose of management reporting: the Retail Banking Group, the Card Services Group, the Commercial Group and the Home Loans Group. The Retail Banking Group, the Card Services Group and the Home Loans Group are consumer-oriented while the Commercial Group serves commercial customers. In addition, the category of Corporate Support/Treasury and Other includes the community lending and investment operations as well as the Treasury function – which manages the Company's interest rate risk, liquidity position and capital. The Corporate Support function provides facilities, legal, accounting and finance, human resources and technology services.

24. The Company's Home Loan business is described as follows in the 2006 Form 10-K:

> The principal activities of the Home Loans Group include: (1) originating and servicing home loans; (2) managing the Company's capital market operations–which includes the buying and selling of all types of mortgage loans in the secondary market; (3) the fulfillment and servicing of the Company's portfolio of home equity loans and lines of credit; (4) originating and purchasing mortgage loans to higher risk borrowers through the subprime mortgage channel; (5) providing financing and other banking services to mortgage bankers for the origination of mortgage loans; and (6) making available insurance-related products and participating in reinsurance activities with other insurance companies.
>
> The segment offers a wide variety of real-estate secured residential loan products and services primarily consisting of fixed-rate home loans, adjustable-rate home loans or "ARMs", hybrid home loans, Option ARM loans and mortgage loans to higher risk borrowers through the subprime mortgage channel. Such loans are either held in portfolio by the Home Loans Group, sold to secondary market participants or transferred through inter-segment sales to the Retail Banking Group. The decision to retain or sell loans, and the related decision to retain or not retain servicing when loans are sold, involves the analysis and comparison of expected interest income and the interest rate and credit risks inherent with holding loans in portfolio, with the expected servicing fees, the size of the gain or loss that would be realized if the loans were sold and the expected expense of managing the risk related

to any retained mortgage servicing rights.

As part of its capital market activities, the Home Loans Group also generates both interest income and noninterest income through its conduit operations. Under the conduit program, the Company purchases loans from other lenders, warehouses the loans for a period of time and sells the loans in the form of whole loans, private label mortgage-backed securities or agency-guaranteed securities. The Company recognizes a gain or loss at the time the loans are sold and receives interest income while the loans are held for sale. The Company also provides ongoing servicing and bond administration for all securities issued.

25.    Through its home loan operating segment, Washington Mutual provides financing to homeowners in the form of home mortgages and "second-lien" products such as home equity loans and home equity lines of credit. These loans are either held by Washington Mutual "in portfolio" or sold to investors - "home loans held for sale."

26.    Loans held for sale are typically pooled and so called "structured finance" securities, such as "mortgage backed-securities" (MBS), "collateralized debt obligations" (CDO) and "collateralized mortgage obligations" (CMO), are issued against that pool. In determining the interest rates and prices that such securities will be issued at, the underwriters and purchasers try to assess the default risk of the underlying mortgages.

27.    An important measure of the risk in a home loan is the loan-to-value ratio ("LTV"), which is the measure of equity retained by the homeowner. A homeowner's equity is generally the difference between the value of the home and the amount of borrowing the homeowner has taken out that is collateralized by the home. For example, if a home has a value of $100,000 and a homeowner has borrowed $80,000 against that home, the homeowner has $20,000 in equity. The "loan-to-value" ratio in that situation is 8:10, or 80%. The value of the appraisal in the loan file is critical to investors in determining the LTV and the associated risk of default in the loan.

28.    In its Form 10-K for 2006, Washington Mutual acknowledges that the less equity a

homeowner has in his or her home, the greater the credit risk to the borrower:

> Home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent also expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of risk is higher when borrowers have less equity in their homes.

29.    In the prior example, the homeowner's property was valued at $100,000.  If that homeowner wanted to borrow an additional $20,000 against the value of the home, it may not be able to because such additional borrowing would reduce their equity to 0% and would result in an LTV of 1:1. This loan would be extremely high risk and the bank may not be able to sell it or would only be able to sell it at a very steep discount or very high interest rate.

30.    Washington Mutual also acknowledges that it uses the LTV to determine the default risk of loans it holds in portfolio.  The risk of default is expressed on the Company's balance sheet as a reserve which reduces the carrying value of the loan.  Loans with high LTVs carry greater risk of nonperformance and thus must carry higher reserves.

31.    Washington Mutual's practice of inducing appraisers to overvalue real property causes increased risk of loss both for loans held in Washington Mutual's portfolio and for loans securitized and sold to third parties.

32.    In certain circumstances, investors who purchase loans from Washington Mutual have recourse against it if the borrower defaults or if there are errors or misrepresentations made in the origination or sale of the loan. In its 2006 Form 10-K, Washington Mutual explained this as follows:

> In the ordinary course of business, the Company sells loans to third parties and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. **The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached. When a loan sold to an**

investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made t o the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.

33.    Inflated, non-independent appraisals of homes that serve as collateral for loans that are securitized, are among the errors or misrepresentations that would allow the purchaser of a loan to have recourse against Washington Mutual - creating undisclosed contingent risk of loss for Washington Mutual in the event it is required to repurchase non-performing loans at face value.

34.    Inflated, non-independent appraisals also cause the present value of the loans held in portfolio by Washington Mutual to be overstated, on a net basis. As described in further detail below, Washington Mutual's 2006 Form 10-K states that the "loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance" and that it uses the loan-to-value ratio in determining risk of default or non-performance on loans held in portfolio. Inflated appraisal values will cause the loan-to-value ratios used by Washington Mutual to establish reserves to be distorted - resulting in understated reserves for loan losses.

35.    Further, Washington Mutual's reserves for losses on loans held for sale should have been higher in light of the substantially increased risk of default and high "loan-to-value" ratios associated with loans issued pursuant to inflated appraisals.

36.    Knowing that issuing loans at such high LTVs would require the loans to be sold at a discount or held at a substantial discount to face value, Washington Mutual obtained inflated appraisals, which would result in a more favorable LTV. In the example, if the home were appraised

17

at a value greater than $100,000, it would provide additional, yet illusory, collateral for Washington

Mutual to lend against. Despite its acknowledgment of the increased risk associated with loans

secured at LTVs of greater than 80%, Washington Mutual engaged in a practice that resulted in the

issuance of loans with far less equity than stated due to the inflated appraisal values it obtained

through eAppraiseIT. Washington Mutual assumed that the majority of loans for which it had

obtained inflated appraisals would be sold off to third party investors and that its practice of

obtaining inflated appraisals would remain undiscovered - leaving the investors on the hook for the

excessive risk of the loan. Loans that were held in portfolio would have loan files that reflected

inflated values and auditors or others who reviewed those files would not require additional reserves.

**Washington Mutual's Relationship**
**With First American's eAppraiseIT**

37.     According to the First American Complaint, Washington Mutual initiated a business

relationship with eAppraiseIT on the pretense that this would create an independent appraisal

process:

> 25.     WaMu retained eAppraiseIT in Spring 2006, after WaMu decided to
> close its internal appraisal office and terminate its staff appraisers. WaMu quickly
> became eAppraiseIT's largest client, providing nearly 30 percent of its business in
> New York. Over the course of the business relationship, eAppraiseIT conducted more
> than 260,000 appraisals for WaMu, receiving over $50 million from WaMu.

> 26.     Initially, eAppraiseIT employed a combination of in-house staff and
> third-party fee appraisers, including some "preferred appraisers" identified by WaMu,
> to conduct appraisals of residential property for WaMu. eAppraiseIT also hired
> approximately 50 former WaMu employees as staff appraisers and Appraisal
> Business Managers ("ABMs") and – at WaMu's request – gave the ABMs the
> authority to override and revise the values reached by third-party appraisers.
> One-third of eAppraiseIT's staff appraisers are former WaMu employees, and all of
> the ABMs are former WaMu employees. eAppraiseIT's President advised the
> leadership of First American that "we have hired and on boarded many of Wamu's
> regional mangers and appraisers last week. They will be instrumental in our relational

and operational success with the sales force."

27.    Under contractual arrangements between WaMu and eAppraiseIT, WaMu can challenge an appraiser's conclusions by requesting a "reconsideration of value" ("ROV") when WaMu disagrees with an appraised home value set forth in an appraisal report. Practically speaking, this permits WaMu to ask eAppraiseIT to reconsider and raise the value assigned to a home. Throughout the business relationship, WaMu has frequently ordered ROVs from eAppraiseIT.

**False and Misleading Statements and**
**Material Omissions Made During the Class Period**

38.    On July 19, 2006, after the close of the financial markets, Washington Mutual issued a press release to report its financial results for the second quarter of 2006, which stated as follows in relevant part:

> Washington Mutual, Inc. (NYSE:WM) today reported second quarter 2006 net income of $767 million, or $0.79 per diluted share, including an after tax adjustment of $101 million to reflect the pending sale of $2.6 billion of mortgage servicing rights and an after tax restructuring charge of $52 million related to the company's efficiency initiatives.
>
> Net income excluding these two items would have been $920 million, or $0.94 per diluted share, compared with net income of $844 million, or $0.95 per diluted share in the second quarter of 2005.

39.    On August 9, 2006, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on July 19, 2006 and disclosed that the Company's portfolio of home loans held for sale was $23.3 billion; net loans held in portfolio included $145.7 billion of home loans and $53.0 billion in home equity loans and lines of credit. The Company reported reserves for loan and lease losses of $1.6 billion.

40.    The August 9, 2006 10-Q included Defendants Killinger's and Casey's certifications under Section 302 of Sarbanes-Oxley Act, as follows:

CERTIFICATION

I, Kerry K. Killinger, certify that:

1.     I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board

Doc. 158816

of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006               /s/ KERRY K. KILLINGER

Kerry K. Killinger
Chairman and Chief Executive Officer
of Washington Mutual, Inc.

\*\*\*

## CERTIFICATION

I, Thomas W. Casey, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006                          /s/ THOMAS W. CASEY
                                              Thomas W. Casey
                                              Executive Vice President and Chief
                                              Financial Officer of Washington Mutual,
                                              Inc.

41.     The August 9, 2006 Form 10-Q also contained certifications by Defendants Killinger and Casey pursuant to Section 906 of the Sarbanes-Oxley Act which stated in pertinent part that each certified "that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc."

42.     Defendants' July 19, 2006 and August 9, 2006 disclosures, referenced above, were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP

standards as codified under Federal and state laws;

b.    The Company's reported income was materially misstated as a result of

loans issued against inflated appraisals;

c.    The Company's reported assets, provision and reserve balances were

materially misstated as a result of loans issued against inflated appraisals;

d.    The Company's substantive disclosures omitted to disclose that appraisals

used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

e.    Defendants Killinger's and Casey's certifications under Sections 302 and

906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal

values, financial misstatements, and substantive false statements and omission of material

information.

43.    On October 18, 2006, after the close of the financial markets, Washington Mutual

issued a press release to report its financial results for the third quarter of 2006, which stated as

follows in relevant part:

> Washington Mutual, Inc. (NYSE: WM) today reported third quarter 2006 net
> income of $748 million, or $0.77 per diluted share compared with net income of
> $821 million, or $0.92 per diluted share, in the third quarter of 2005.
> Third quarter 2006 earnings included net after tax charges of $31 million, or $0.03
> per diluted share, related to the previously announced sale of $2.53 billion of
> mortgage servicing rights, and after tax charges of $33 million, or $0.04 per
> diluted share, related to the company's ongoing efficiency initiatives, which are
> expected to continue into the fourth quarter.
>                                    ***
> • Credit exposure continues to be proactively managed. The provision for loan and
> lease losses of $166 million in the third quarter reflected a slight decline in the
> loan portfolio and net charge-offs of $154 million.

44.     On November 9, 2006, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on October 18, 2006 and disclosed that the Company's portfolio of home loans held for sale was $23.7 billion; loans held in portfolio included $141.2 billion of home loans and $54.4 billion in home equity loans and lines of credit.  The Company reported reserves for loan and lease losses of $1.6 billion.

45.     The November 9, 2006 Form 10-Q included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

46.     Defendants' October 18, 2006 and November 9, 2006 disclosures, referenced above, were materially false and misleading because:

a.     Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.     The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.     The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.     The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

e.     Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal

values, financial misstatements, and substantive false statements and omission of material

information.

47.    On January 17, 2007 after the close of the financial markets, Washington Mutual

issued a press release to report its financial results for the fourth quarter of and full year 2006,

which stated as follows in relevant part:

> Washington Mutual, Inc. (NYSE: WM) today reported fourth quarter 2006 net
> income of $1.06 billion, or $1.10 per diluted share, compared with net income of
> $865 million, or $0.85 per diluted share, in the fourth quarter of 2005. Net income
> for 2006 was $3.56 billion, or $3.64 per diluted share, compared with net income
> of $3.43 billion, or $3.73 per diluted share, in 2005.
>
> ***
>
> Killinger noted that opportunities to grow the balance sheet at attractive
> risk-adjusted returns are limited, making the accelerated share repurchase
> transaction a superior use of capital.
>
> "Our outlook for 2007 reflects the strategic actions we took in 2006 to prepare the
> company for the future," Killinger added. "Those decisive actions have positioned
> us well to deliver stronger operating performance in 2007."
>
> ***
>
> Provision driven by credit card growth. The increase in the fourth quarter
> provision for loan and lease losses to $344 million in part reflected the growth of
> the company's on-balance sheet credit card receivables, which increased the
> provision by $95 million compared with the prior quarter.

48.    On March 1, 2007, the Company filed its annual report on Form 10-K with the

SEC, which disclosed that the Company's portfolio of home loans held for sale was $44.9

billion; loans held in portfolio included $99.5 billion of home loans, $52.9 billion in home equity

loans and lines of credit, $18.7 billion in subprime home loans, and $2 billion in subprime home

equity loans and lines of credit. The Company reported reserves for loan and lease losses of

$1.63 billion, with $202 million attributable to home loans, $184 million attributable to home

equity loans and lines of credit and $326 million attributable to the "subprime mortgage

channel." Washington Mutual disclosed that of the loans secured by residential property held in

portfolio, 38% had loan-to-value ratios of greater than 80%.

49.    The 2006 Form 10-K stated as follows regarding loan loss reserves and contingent

credit risk liabilities (emphasis added):

> **Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**
> *Allowance for loan and lease losses*
>     The allowance for loan and lease losses represents management's estimate
> of incurred credit losses inherent in the Company's loan and lease portfolios as of
> the balance sheet date. The estimation of the allowance is based on a variety of
> factors, including past loan loss experience, the current credit profile of the
> Company's borrowers, adverse situations that have occurred that may affect the
> borrowers' ability to repay, the estimated value of underlying collateral, the
> interest rate climate as it affects adjustable-rate loans and general economic
> conditions. Loans held in portfolio that are evaluated for collective impairment
> and loans held in portfolio that are individually reviewed for impairment but
> deemed not to be impaired may have both an allocated and unallocated allowance.
> Loans that are individually deemed to be impaired may only have an allocated
> allowance.
>     The allowance for loans evaluated for collective impairment is comprised
> of an allocated allowance that is computed for each portfolio based on specific
> loan portfolio metrics and an unallocated allowance that is computed based on
> certain environmental factors we believe are not adequately captured in the
> allocated allowance computations. Determining the adequacy of the allowance,
> particularly the unallocated allowance, is complex and requires judgment by
> management about the effect of matters that are inherently uncertain. Subsequent
> evaluations of the loan portfolio, in light of the factors then prevailing, may result
> in significant changes in the allowance for loan and lease losses in future periods.
>     The allowance is comprised of an allowance for individually impaired
> loans, as well as an allowance for other individually unimpaired loans that share
> common risk characteristics that, in the aggregate, have incurred a probable loss
> on a collective basis. The determination of common risk factors that indicate a
> probable loss on a collective basis is complex and requires significant judgment
> by management about the shared risk characteristics that suggest a probable loss.
>     The allowance for loan and lease losses is reported within the
> Consolidated Statements of Financial Condition and the provision for loan and
> lease losses is reported within the Consolidated Statements of Income.
>     The estimates and judgments are described in further detail in the
> subsequent section of Management's Discussion and Analysis – "Credit Risk
> Management" and in Note 1 to the Consolidated Financial Statements –
> "Summary of Significant Accounting Policies."
> *Contingent Credit Risk Liabilities*
>     In the ordinary course of business, the Company sells loans to third parties

and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. **The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached. When a loan sold to an investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made t o the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.**

Reserves are established for the Company's exposure to the potential repurchase or indemnification liabilities described above as such liabilities are generally recorded at fair value. Throughout the life of these repurchase or indemnification liabilities, the Company may learn of additional information that can affect the assessment of loss probability or the estimation of the amounts involved. Changes in these assessments can lead to significant changes in the recorded reserves. Repurchase and indemnification liabilities are recorded within other liabilities on the Consolidated Statements of Financial Condition, and losses are recorded on the Consolidated Statements of Income under the noninterest income caption "Revenue from sales and servicing of home mortgage loans."

50.    The 2006 Form 10-K contained numerous disclosures concerning the use of loan-to-value ratios in assessing credit risk, including the following statements:

Under the heading "Credit Risk Management":

Many factors or loan attributes are used to predict and to monitor credit risk in the Company's real estate secured loan portfolios, including borrowers' debt-to-income ratios when loans are made, borrowers' credit scores, loan-to-value ratios and, with respect to residential loans, housing prices. The Company actively monitors changes in borrowers' credit scores, changes in loan-to-value ratios and housing price trends across the country. A slowdown in housing price appreciation or declines in housing prices will likely have the effect of increasing credit risk in the Company's real estate secured portfolios. The Company believes that loan-to-value ratios and credit scores are more predictive of future loan performance than are other loan factors and attributes.

***

As noted above, loan-to-value ratios and borrowers' credit scores are key determinants of future loan performance. The Company has also observed that, when comparing portfolios of prime mortgage loans and portfolios of subprime mortgage channel loans that possess comparable credit scores and loan-to-value