ratios, the subprime mortgage channel portfolios generally experience higher delinquencies and losses.

Under the heading "Features of Residential Loans":

Certain residential loans have features that may result in increased credit risk when compared with residential loans without those features. Categories of loans within the Company's portfolio that have such features include loans with an option to defer the payment of interest (i.e., Option ARM home loans), home loans where the loan-to-value ratio is greater than 80 percent, home equity loans and lines of credit where the combined loan-to-value ratio is greater than 80 percent, and interest-only payment loans. The loan-to-value ratio measures the ratio of the original loan amount to the appraised value of the collateral at origination. The combined loan-to-value ratio measures the ratio of the original loan amount of the first lien product (typically a first lien mortgage loan) and the original loan amount of the second lien product (typically a second lien home equity loan or line of credit) to the appraised value of the underlying collateral. Where the second lien product is a line of credit, the total commitment amount is used in the combined loan-to-value calculation.

Under the Section "Impact of External Risk Factors":

*Home Loans with Loan-to-Value Ratios Greater than 80 percent without Private Mortgage Insurance or Government Guarantees*
Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure. At December 31, 2006, home loans held in portfolio with these features amounted to $7.48 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent. Substantially all of these loans were made to subprime borrowers, including $5.56 billion of loans purchased from recognized subprime lenders. Total home loans with these features accounted for 16% of the Company's home loan volume in 2006. Home loans held in portfolio with loan-to-value ratios in excess of 90 percent at origination without private mortgage insurance or government guarantees amounted to $847 million, or 0.7%, of home loans held in portfolio at December 31, 2006.

***

*Home Equity Loans and Lines of Credit where the Combined Loan-to-Value Ratio is Greater than 80 percent*
Instead of undertaking cash-out refinance transactions, many borrowers elect to utilize accumulated equity in their homes by borrowing money through

either a first or second lien home equity loan or line of credit. The existence of a
first lien mortgage loan and second lien home equity loan or line of credit made to
one borrower and secured by the same property, most often arises when the
Company:
• Originates the first lien mortgage loan and second lien home equity loan or line
of credit at the same time (so called "piggyback" loans);
• Originates or purchases the first lien mortgage loan and at a subsequent date
originates a second lien home equity loan or line of credit;
• Originates a second lien home equity loan or line of credit subordinate to another
lender's first lien mortgage loan.

* * *

The balance of home equity loans and lines of credit with combined
loan-to-value ratios of greater than 80 percent at origination totaled $15.59 billion
at December 31, 2006 and accounted for 36% of the Company's home equity
volume in 2006. Substantially all of the loans and lines of credit in this portfolio
had a combined loan-to-value ratio at origination of between 80 and 90 percent.

To compensate for the increased credit risk in the home equity portfolio
that arises where the combined loan-to-value ratio at origination is greater than 80
percent, the Company typically charges such borrowers a higher rate of interest
than would be charged if the combined loan-to-value ratio at origination was less
than 80 percent. The Company also buys pool mortgage insurance that insulates it
from the risk of default on those home equity loans or lines of credit where the
combined loan-to-value ratio at origination is greater than 90 percent.

51.    The 2006 Form 10-K provided the following disclosure concerning the

Company's internal controls, which stated that the Company's management found the internal

controls adequate:

### Management's Report on Internal Control Over Financial Reporting

The management of Washington Mutual, Inc. and subsidiaries (the
"Company") is responsible for establishing and maintaining effective internal
control over financial reporting, including safeguarding of assets. The Company's
internal control structure contains monitoring mechanisms, and actions are taken
to correct deficiencies identified.

There are inherent limitations in the effectiveness of any internal control,
including the possibility of human error and the circumvention or overriding of
controls. Accordingly, even effective internal control can provide only reasonable
assurance with respect to financial statement preparation. Further, because of
changes in conditions, the effectiveness of internal control may vary over time.

Management assessed the effectiveness of the Company's internal control
over financial reporting, including safeguarding of assets as of December 31,
2006. This assessment was based on criteria for effective internal control over

financial reporting, including safeguarding of assets, described in "Internal Control – Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management believes that, as of December 31, 2006, the Company maintained effective internal control over financial reporting, including safeguarding of assets.

52.     The 2006 Form 10-K included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

53.     The 2006 10-K also incorporated the Company's Code of Ethics and Code of Conduct by reference, which it noted were available on Washington Mutual's website. As of November 4, 2007, the Company's Code of Ethics stated as follows:

> The Chief Executive Officer, President, Chief Financial Officer, Controller, and each business segment or business line president, chief financial officer and controller and persons determined to be performing similar functions (collectively, the "Senior Financial Officers") of Washington Mutual, Inc. (together with its subsidiaries and affiliates, separately or collectively, as the context may require, the "Company") have an obligation to the public, the Company, and themselves to maintain the highest standards of ethical conduct.

> The Code of Ethics for Senior Financial Officers (the "Ethical Code") provides fundamental principles to which the Senior Financial Officers are expected to adhere and advocate. These principles are designed to deter wrongdoing and to promote:

> Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities Exchange Commission (the "SEC") and in other public communications made by the Company; Compliance with applicable governmental laws, rules and regulations; The prompt internal reporting to an appropriate person or persons identified in the Ethical Code of violations of the Ethical Code; and Accountability for adherence to the Ethical Code.

> This Ethical Code supplements the Company's Code of Conduct and reflects our Corporate Values to be Fair, Caring, Human, Dynamic, and Driven. The Senior

Financial Officers are expected to abide by the Ethical Code as well as the Company's Code of Conduct and all other applicable Washington Mutual policies and guidelines referred to in the Company's Code of Conduct.

**Financial Reporting and Disclosure**

Senior Financial Officers will seek to promote fair, accurate, timely, and understandable disclosure in the reports and documents the company files with or submits to the SEC. The Company seeks to provide disclosure to the investment community that is not only in conformity with applicable rules of the SEC, but that also fairly presents to investors the financial condition and results of operations of the company. Senior Financial Officers shall seek to promote ethical behavior by other company officers and employees involved in financial reporting.

**Consequences of Violations**

Any violation of this Ethical Code may result in disciplinary action including, but not limited to, the following:

Disciplinary action (up to and including suspension or termination of employment);

Pursuit of any and all remedies available to the Company for any damages or harm resulting to the Company from a violation, including injunctive relief; and

Referral of matters to appropriate legal or regulatory authorities for investigation and prosecution.

**Reporting of Violations**

Any employee of the Company who becomes aware of actual or potential infractions of this Code of Ethics or who has concerns regarding questionable accounting or auditing matters involving the Company or a Senior Financial Officer should submit a report to the Audit Committee by calling 1-800-214-8771. An operator is available to take your report and direct it to the appropriate person for investigation and response. This service is confidential and anonymous.

**Requests for Waivers and Changes in Ethical Code**

Waivers of this Code of Ethics may only be granted by the Audit Committee of the Board of Directors of the Company. The Audit Committee will not grant waivers except under extraordinary circumstances. Any waivers that are granted shall be publicly disclosed on a timely basis. In addition, any changes to this Ethical Code shall be publicly disclosed on a timely basis.

**Annual Certifications**

Annually each Senior Financial Officer shall certify in writing his or her

compliance during the prior year with this Code of Ethics.

**Evaluation**
The Audit Committee shall evaluate annually the effectiveness of this Code of Ethics and recommend and adopt changes as necessary.

54.     As available on Washington Mutual's website as of November 4, 2007, the

Company's Code of Conduct stated as follows, in relevant part:

**Introduction**
Washington Mutual's Code of Conduct applies company wide. It addresses issues that concern Washington Mutual, Inc., and all of its subsidiaries (collectively, "Washington Mutual" or the "Company") and applies to the members of the Board of Directors as indicated, and to all employees, including officers, regardless of which Washington Mutual company employs them.
                                                                        ***

**Honesty and fair dealing**
The Company expects its employees to do their jobs with absolute honesty and integrity. The federal and state agencies that regulate many of Washington Mutual's various bank and non-bank subsidiaries require Washington Mutual to maintain a financial bond covering all affected employees. The bond does not, however, cover any employee that Washington Mutual knows has committed certain dishonest or fraudulent acts. Acts of dishonesty may result in the Company terminating the offender's employment.

**Fair dealing**
Washington Mutual strives to ensure that all of its actions are guided by absolute honesty, integrity and fairness. The Company believes that cooperation, trust and shared objectives are vital to its success. As a result, you are expected to deal fairly with Washington Mutual's customers, suppliers, competitors and employees. You may not take unfair advantage of anyone else through manipulation, concealment, abuse of confidential information, misrepresentation of material facts or other unfair business practice.

**Accuracy and completeness of Company records**
Washington Mutual has established very high standards for service and performance. As a Washington Mutual employee, you must maintain all Company records within your control completely and accurately, including time reporting records. You may not structure accounts or other corporate records so as to avoid reporting or signing authority requirements, nor may you misrepresent a transaction to make it appear more beneficial to the Company or anyone else than it really is. Washington Mutual considers falsifying or misrepresenting Company accounts and records to be the equivalent of fraud.

\*\*\*

**Compliance with laws, rules and regulations**

As a financial services company, Washington Mutual operates in a highly regulated business environment. Accordingly, you are expected to understand, respect and comply with all of the laws, regulations, policies and procedures that apply to you in your position with Washington Mutual. If you have any doubt, you should talk to your manager or compliance officer, or the Company's Legal Department, to determine and understand the applicability of the laws, regulations and Company procedures and policies that apply to your position.

55.     The January 17, 2007 and March 1, 2007 statements referenced above were materially false and misleading because:

      a.     Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

      b.     The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

      c.     Defendants' attribution of the increase in loan loss provision to Washington Mutual's credit card business created the false impression that provision and reserves on home loans were adequate;

      d.     The Company's reported contingent risks and liabilities were understated as investors who purchased non-performing loans based on inflated appraisals may force Washington Mutual to repurchase such nonperforming loans resulting in undisclosed losses and liabilities;

      e.     The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

      f.     The Company's substantive disclosures concerning the adequacy of its internal controls were materially false and misleading in light of the intentional inflation of

appraisals by Company executives;

g.    The Company failed to disclose that its Code of Ethics and Code of

Conduct were being knowingly violated through the intentional manipulation of the appraisal

process, in violation of legal and ethical standards; and

h.    Defendants Killinger's and Casey's certifications under Sections 302 and

906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal

values, financial misstatements, and substantive false statements and omission of material

information.

56.    On April 17, 2007, after the close of the financial markets, Washington Mutual issued

a press release to report its financial results for the first quarter of 2007, which stated as follows in

relevant part:

> Washington Mutual, Inc. (NYSE:WM) reported first quarter 2007 net income of
> $784 million, or $0.86 per diluted share, compared with net income of $985 million,
> or $0.98 per diluted share, in the first quarter of 2006, a period that included an $85
> million after tax partial settlement related to Home Savings goodwill litigation.
> Based on these earnings and the company's strong financial position, the Board of
> Directors increased the cash dividend on the company's common stock for the 47th
> consecutive quarter to 55 cents per share.
>
> "Our Retail Banking, Card Services, and Commercial groups continued to post strong
> results in the first quarter as we successfully attracted a growing number of new
> customers to our expanding national banking franchise," said Kerry Killinger, the
> company's chairman and CEO. "Overall, we delivered solid results in the first quarter
> despite the challenging interest rate environment and slowing housing market."
> "Our Home Loans business was challenged during the first quarter by difficult market
> conditions," he added. "Over the past 12 months, we have taken a number of prudent
> actions to reduce our exposure to the subprime mortgage industry. These actions,
> along with a diversified business mix, limited our exposure to the mortgage market's
> downturn and position us well to expand and grow as market conditions improve."
>                                    ***
> -- Decrease in home loan volume reflects strategic actions. The decline in home loan
> volume from the fourth quarter was the result of the proactive steps the company has
> taken to reduce its subprime exposure through this point in the cycle. Subprime

mortgage production for the first quarter was down 51 percent from the same quarter in 2006. The decline in home loan volume, year over year, also reflected the company's decision to exit its traditional correspondent business.

57.    On May 10, 2007, Washington Mutual filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on April 17, 2007 and disclosed that the Company's portfolio of home loans held for sale was $26.9 billion; loans held in portfolio included $93.5 billion of home loans, $53.4 billion in home equity loans and lines of credit, $17.6 billion in subprime home loans and $2.8 billion in subprime home equity loans and lines of credit. The Company reported reserves for loan and lease losses of $1.5 billion.

58.    The May 10, 2007 Form 10-Q included Defendants Killinger's and Casey's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form 10-Q.

59.    Defendants' April 17, 2007 and May 10, 2007 disclosures, referenced above, were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.    The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.    The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.    The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

     e.     Defendants Killinger's and Casey's certifications under Sections 302 and 906

of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values,

financial misstatements, and substantive false statements and omission of material information.

     60.     On July 18, 2007, after the close of the financial markets, Washington Mutual issued

a press release to report its financial results for the second quarter of 2007, which stated as follows

in relevant part (emphasis added):

> WaMu (NYSE:WM) announced today that second quarter 2007 earnings per share
> increased 16 percent from a year ago. Continued strong performance led to net
> income of $830 million, or $0.92 per diluted share, compared with net income of
> $767 million, or $0.79 per diluted share, in the second quarter of 2006. Second
> quarter net income was also up from $784 million, or $0.86 per share, in the prior
> quarter.
>
> "We delivered record growth in our retail banking, credit card and commercial
> businesses during the second quarter. **Our Home Loans' results improved from the
> first quarter and we are targeting a return to profitability by the end of the
> year,"** said Chairman and CEO Kerry Killinger. **"I'm pleased with the job our
> employees are doing in growing the franchise, delivering best-in-class customer
> service, as evidenced by our recent J.D. Power award recognition, and focusing
> on improving our operating efficiency."**

     61.     On August 9, 2007, Washington Mutual filed its quarterly report on Form 10-Q with

the SEC, which substantially incorporated the financial results released on July 19, 2007 and

disclosed that the Company's portfolio of home loans held for sale was $19.3 billion; loans held in

portfolio included $88.5 billion of home loans, $55.8 billion in home equity loans and lines of credit,

$17.6 billion in subprime home loans and $2.9 billion in subprime home equity loans and lines of

credit. The Company reported reserves for loan and lease losses of $1.56 billion.

     62.     The August 9, 2007 Form 10-Q included Defendants Killinger's and Casey's

certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all

material respects to those certifications filed by Killinger and Casey with the August 9, 2006 Form

10-Q.

63.    Defendants' July 19, 2007 and August 9, 2007 disclosures, referenced above, were

materially false and misleading because:

  a.  Defendants failed to disclose their intentional violations of the USPAP

standards as codified under Federal and state laws;

  b.  The Company's reported income was materially misstated as a result of loans

issued against inflated appraisals;

  c.  The Company's reported assets, provision and reserve balances were

materially misstated as a result of loans issued against inflated appraisals;

  d.  The Company's substantive disclosures omitted to disclose that appraisals

used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated;

  e.  Defendants Killinger's and Casey's certifications under Sections 302 and of

the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values,

financial misstatements, and substantive false statements and omission of material information.

**The Market Begins to Learn the**
**Nature and Magnitude of the Wrongdoing**

64.    On October 17, 2007, after the close of the financial markets, Washington Mutual

issued a press release to report its financial results for the third quarter of 2007, which stated as

follows in relevant part (emphasis added):

> WaMu (NYSE:WM) announced today that third quarter 2007 net income of $210
> million, or $0.23 per diluted share, compared with net income of $748 million, or
> $0.77 per diluted share, in the third quarter of 2006. **The company attributed the**
> **decline to a weaker housing market and disruptions in the capital markets.**
>
> "We're disappointed with our third quarter results but they reflect the increasingly
> difficult market conditions that are challenging the banking industry," said WaMu

Chairman and Chief Executive Officer Kerry Killinger. "Despite these challenges, our Retail Banking, Card Services and Commercial businesses delivered good operating performance during the quarter, **and we continued to adapt our Home Loans business to meet market conditions.**" Killinger added that the company remains focused on executing its long-term growth plans.

***

-- Increase in provision reflects further weakness in the housing market. The quarter's provision increased to $967 million from $372 million in the prior quarter in response to higher delinquencies and impacts from recent house price trends, as well as the $22.1 billion, or 10 percent, growth in the company's loan portfolio during the quarter. The increase in the non-card portion of the provision to $644 million from $143 million in the second quarter was driven by further weakening in the housing market, primarily as it affects subprime and home equity loans.

-- The company also increased the provision for loan losses for credit cards to $323 million from $229 million in the second quarter reflecting a higher level of delinquencies and a lower level of anticipated recoveries.

65.    During the Company's October 17, 2007 conference call with investors, Defendant

Casey disclosed that Washington Mutual's "allowance for loan and lease losses [was] $1.9 billion

at quarter end, up 21 percent from the end of the second quarter."

66.    With respect to the outlook for the balance of the year, during the October 17, 2007

conference call Defendant Casey stated as follows:

As we consider our credit provisioning outlook for the remainder of the year, let me just say that I have never seen housing credit conditions change so significantly over such a short period of time. Nor can I remember a period when there was less clarity about near-term housing and credit trends.

As I discussed in detail earlier, we have seen a sharp deterioration in the housing market since our second quarter earnings call and a further acceleration of adverse trends in our portfolio since we updated our guidance last in September. The guidance I provide you today is based on our best thinking given the facts that are currently available. However, we expect the market will continue to change quickly.

The main drivers of our credit provision are the level of delinquencies and charge-offs in our portfolio, both of which rose sharply in the third quarter as home prices declined in many of our major markets. Based on our current view of the macro environment for housing and our own portfolio data, we expect delinquencies

and charge-offs in our portfolio to increase further during the fourth quarter.

Considering the weakening housing market and adverse trends in the third quarter, our best estimate at this time is that charge-offs in our portfolio will increase between 20 and 40 percent in the fourth quarter and that our total 2007 provision will be between $2.7 and $2.9 billion.

67.    Defendants' October 17, 2007 disclosures, referenced above, were materially false and misleading because:

a.    Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

b.    The Company's reported income was materially misstated as a result of loans issued against inflated appraisals;

c.    The Company's reported assets, provision and reserve balances were materially misstated as a result of loans issued against inflated appraisals;

d.    The Company's statements regarding loan loss reserves and provision for credit losses failed to disclose that a material portion of such asset impairments was related to loans issued based on inflated appraisals;

e.    The Company's disclosures concerning anticipated asset writedowns to be taken during the fourth quarter reflect that past asset balances were overstated due to the improper use of inflated appraisals; and

f.    The Company's substantive disclosures omitted to disclose that appraisals used to determine loan-to-value ratios - a critical risk metric - were being improperly inflated.

68.    Despite Defendants' continuing failure to disclose the improprieties related to Washington Mutual's manipulation of the home mortgage market, the market did begin to realize that there was a significant deterioration in Washington Mutual's balance sheet and home loan

business that was not entirely attributable to those reasons provided by the Company. This decline

was noted in an October 31, 2007 commentary by Jonathan Weil of Bloomberg:

> Oct. 31 (Bloomberg) -- If you think the worst is over for mortgage lenders, a close look at Washington Mutual Inc.'s balance sheet should dispel that notion pretty quickly.
>
> The largest U.S. savings and loan stunned investors on Oct. 17 when it said it would set aside as much as $1.3 billion this quarter to cover anticipated loan losses. The news came the same day Washington Mutual announced a 72 percent drop in third-quarter net income to $210 million.
>
> Since then, Washington Mutual's stock has fallen 15 percent. And at $28.11, the Seattle-based thrift now trades for only slightly more than its book value, or assets minus liabilities, while its dividend yield is a whopping 8 percent.
>
> The signal from the market: Washington Mutual's dividend and book value aren't sustainable -- and with good reason.
>
> Washington Mutual has paid more than $1.9 billion in cash dividends over the past year, including $485 million last quarter. Meanwhile, the real wonder is that Washington Mutual's forecast for fourth-quarter loan-loss provisions wasn't substantially higher.
>
> First, a brief accounting primer: Loan-loss allowances are the reserves that lenders set up on their balance sheets in anticipation of bad loans. Provisions are the expenses lenders record to boost their loan-loss allowances. As loans are written off, lenders record charge-offs, reducing their allowances.
>
> For the third quarter, Washington Mutual recorded $967 million in loan-loss provisions and $421 million in net charge-offs. Those and other actions brought the company's loan-loss allowance to $1.89 billion at Sept. 30, up from $1.56 billion at June 30.
>
> ### Looks Light
>
> As for the fourth quarter, Washington Mutual predicted that provisions would be $1.1 billion to $1.3 billion and that charge-offs would increase 20 percent to 40 percent.
>
> To see why even $1.3 billion in provisions looks light, consider Washington Mutual's $57.86 billion of so-called option- ARM loans, which make up 24 percent of Washington Mutual's loan portfolio. These adjustable-rate mortgages were popular during the housing bubble, because they give customers the option of postponing interest payments, which the lender then adds to their principal balances.
>
> As of Sept. 30, the unpaid principal balance on Washington Mutual's option ARMs exceeded the loans' original principal amount by $1.5 billion, meaning the customers owed $1.5 billion more in principal than what they originally borrowed. By comparison, that figure was $681 million a year earlier, when Washington Mutual had $67.14 billion, or 16 percent more, option ARMs on its books.

Look to the end of 2005, and the trend becomes even starker. Back then, Washington Mutual had even more option ARMs on its balance sheet, at $71.2 billion. Yet the unpaid principal balance exceeded the original principal amount by only $160 million -- and that was up from a mere $11 million at the end of 2004.

### Deferring Pain

The deferred interest from option ARMs also boosts Washington Mutual's earnings, part of a process known as negative amortization, or ``neg-am.'' That's because option-ARM lenders recognize interest income when customers postpone their interest payments, even though the lenders got no cash.

For the nine months ended Sept. 30, Washington Mutual recognized $1.05 billion in earnings as a result of neg-am within its option-ARM portfolio. That represented 7.2 percent of Washington Mutual's $14.61 billion of total interest income year-to-date. By comparison, neg-am contributed 1.8 percent of Washington Mutual's interest income for all of 2005 and just 0.2 percent for 2004.

What's going on here? Either the borrowers postponing their interest payments are doing so as a matter of choice, by and large, or they can't afford to pay them. Common sense suggests it's the latter -- and that there's serious doubt Washington Mutual ever will collect the $1.5 billion of postponed interest that its option-ARM customers have added to their original principal balances.

### No Questions

Yet the $1.1 billion to $1.3 billion of fourth-quarter provisions that Washington Mutual predicted -- for the company as a whole -- wouldn't even cover the $1.5 billion of tacked-on principal. The trend among Washington Mutual's option ARMs shows no sign of slowing, either.

Through a spokeswoman, Libby Hutchinson, Washington Mutual officials declined to comment. She said the company's executives aren't fielding questions until their next meeting with investors on Nov. 7.

Then there's the bigger picture. While Washington Mutual's loan-loss allowance rose 22 percent to $1.89 billion during the 12 months ended Sept. 30, nonperforming assets rose 128 percent to $5.45 billion. So even if Washington Mutual adds $1.3 billion in provisions next quarter, its loan-loss allowance still won't be anywhere close to catching up.

To be sure, Washington Mutual executives have some latitude over the timing of the company's loan-loss provisions. Yet they also may have a monetary incentive to push losses into 2008.

Under the formula Washington Mutual's compensation committee will use to determine executive bonuses this year, 40 percent is weighted toward 2007 earnings-per-share targets, according to the company's latest proxy. Goals related to non-interest expense and non-interest income each count for 25 percent, while ``customer loyalty'' goals count for 10 percent.

Postponed Reckoning

The proxy didn't disclose the specific goals for those performance measures. Still, it stands to reason that Washington Mutual executives would come closer to hitting the EPS goal if they minimize loan losses this year.

On its Web site, Washington Mutual says the reason it no longer provides EPS forecasts to the public is that ``many believe EPS guidance tends to focus management on near-term rather than long-term performance."

The same, of course, is true for executive bonuses that are tied heavily to yearly EPS targets. If Washington Mutual's management is more focused on near-term performance now, as the numbers suggest, this might help explain it.

69.     As noted in this article, on October 18, 2007, following Washington Mutual's October 17, 2007 announcement of third quarter results and disclosure of additional anticipated asset writedowns, the stock declined by $2.55, or 7.8%, from its October 17, 2007 closing price of $33.07 per share. This decline continued through October 31, 2007 when Washington Mutual shares closed at $27.88 each, down a total of $5.19 per share, or 15.7%, since the release of third quarter financial results.

**The First American Complaint Provides Further Information About Defendants' Fraudulent Scheme**

70.     As detailed above at length, on November 1, 2007 New York Attorney General Andrew Cuomo filed the First American Complaint which alleges a complex scheme undertaken by senior Washington Mutual executives to manipulate the value of appraisals provided by eAppraiseIT.

71.     The degree of pressure exerted by Washington Mutual executives demonstrated by these allegations illustrates that this was not an isolated incident, but a systematic manipulation by of the appraisal process by Defendants. This scheme caused the overstatement of assets subsequently written down by Washington Mutual during the third quarter of 2007, anticipated future writedowns during the fourth quarter of 2007 and other false statements, as

alleged above, during the Class Period.

72.    The allegations in the First American Complaint partially revealed to the market the fraudulent scheme undertaken by Defendants. After absorbing this news, shares of the Company's stock sank on November 1, 2007 and November 2, 2007, closing at $23.81 on November 2, 2007, down $4.07 per share, or 15%, from the $27.88 per share closing price on October 31, 2007.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a Class Action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of the publicly traded securities of Washington Mutual between July 19, 2006 and October 31, 2007. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

74.    At all relevant times, the market for Washington Mutual securities was an efficient market for the following reasons, among others:

a.    Washington Mutual securities met the requirements for listing, and were listed, on the New York Stock Exchange ("NYSE"), an efficient and automated market;

b.    During the Class Period, millions of shares of Washington Mutual securities were traded on the open market;

c.    As a regulated issuer, Washington Mutual filed periodic public reports with the SEC and the NYSE; and

d.    Washington Mutual was followed by numerous securities analysts

employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

75.    As a result, the market for Washington Mutual securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Washington Mutual's Share price. Under these circumstances, all purchasers of the Company's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

76.    This action is properly maintainable as a class action because:

a.    The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. Throughout the Class Period, Washington Mutual securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class;

b.    Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and the members of the Class purchased Washington Mutual shares and sustained damages as a result of the defendants' wrongful conduct complained of herein;

c.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

d.    A class action is superior to other available methods for the fair and

efficient adjudication of the claims asserted herein. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

   e. The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

   i. whether the federal securities laws were violated by defendants' acts as alleged herein;

   ii. whether statements disseminated to the investing public and to Washington Mutual's shareholders during the Class Period misrepresented material facts about the operating results and financial condition of the Company;

   iii. whether defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting to state material facts;

   iv. whether, during the Class Period, the market price of Washington Mutual securities was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

   v. whether the defendants participated in and pursued the common course of conduct complained of herein; and

   vi. whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

   77. Plaintiff anticipates no unusual difficulties in the management of this action as a

class action.

## NO SAFE HARBOR/ADDITIONAL SCIENTER ALLEGATIONS

78.    As alleged herein, the Defendants acted with scienter because at the time that they

issued public documents and other statements in Washington Mutual's name, they knew or

recklessly disregarded the fact that such statements were materially false and misleading, or

omitted to disclose material facts.  Moreover, the Defendants knew such documents and

statements would be issued or disseminated to the investing public, knew that persons were

likely to rely upon those misrepresentations and omissions, and knowingly and recklessly

participated in the issuance and dissemination of such statements and documents as primary

violators of the federal securities laws.

79.    As set forth in detail throughout the Complaint, the Defendants, by virtue of their

control over, and/or receipt of Washington Mutual's materially misleading statements, and their

positions with the Company which made them privy to confidential proprietary information

concerning Washington Mutual's improper appraisal practices, and used such information to

artificially inflate Washington Mutual financial results.  The Defendants created, were informed

of, participated in, and knew of, the scheme alleged herein to distort and suppress material

information pertaining Washington Mutual's improper manipulation of appraisals.  With respect

to non-forward looking statements and omissions, the Defendants knew and recklessly

disregarded the falsity and misleading nature of that information, which they caused to be

disseminated to the investing public.  The statutory safe harbor provided for forward-looking

statements under certain circumstances does not apply to any of the false statements pleaded in

this Complaint. None of the statements pleaded herein are "forward-looking" statements and no

such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

80.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Washington Mutual who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER

81.    Plaintiff repeats and realleges each and every allegation above, as if set forth in

Doc. 158816                                    47

full herein.

82.    Throughout the Class Period, defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Washington Mutual securities.

83.    The purpose and effect of defendants' plan, scheme and course of conduct were to artificially inflate the price of Washington Mutual's securities and to artificially maintain the market price of Washington Mutual securities.

84.    The Individual Defendants, who were the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Washington Mutual personnel to members of the investing public, including Plaintiff and the Class, and the securities analysts.

85.    As a result of the foregoing, the market price of Washington Mutual securities was artificially inflated during the Class Period. In ignorance of the falsity of the defendants' statements concerning the operating results and performance of Washington Mutual, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or

48

the integrity of the market price of Washington Mutual securities during the Class Period in purchasing Washington Mutual securities at prices which were artificially inflated as a result of defendants' false and misleading statements.

86.    Had Plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Washington Mutual securities at the artificially inflated prices that they did.

87.    Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased Washington Mutual securities in ignorance of the financial risk to them as a result of such nondisclosures.

88.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

89.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Washington Mutual, their control over, and/or receipt and/or modification of Washington Mutual' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Washington Mutual, participated in the fraudulent scheme alleged herein.

90.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the defendants had actual knowledge that the particular forward-looking statement was false.

91.    The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

92.    By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Washington Mutual securities during the Class Period.

**COUNT II**

**AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(A) FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT**

93.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

Doc. 158816                                    50

94.    During the Class Period, each of the Individual Defendants, by virtue their offices at, and directorship of Washington Mutual and their specific acts, was a controlling person of Washington Mutual within the meaning of Section 20(a) of the Exchange Act.

95.    Each Individual Defendant's positions made him privy to, and provided him with actual knowledge of, the material facts which the Individual Defendants and Washington Mutual concealed from Plaintiff and the other members of the Class during the Class Period.

96.    Each of the Individual Defendants had the power and influence, and exercised same, to engage in the unlawful conduct and practices complained of herein by causing Washington Mutual to disseminate the false and misleading information referred to above.

97.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

98.    By virtue of the conduct alleged above, the Individual Defendants are liable to the Plaintiff and the other members of the Class for the substantial damages that they suffered in connection with their purchases of Washington Mutual's securities during the Class Period.

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the defendants as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

C.    Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all defendants, jointly and severally, in favor

of Plaintiff and the other members of the Class for all losses and damages suffered as a result of

the acts and transactions complained of herein, together with prejudgment interest from the date

of the wrongs to the date of the judgment herein;

   E. Awarding Plaintiff the costs, expenses, and disbursements incurred in this action,

including reasonable attorneys' and experts' fees; and

   F. Awarding Plaintiff and the other members of the Class such other and further

relief as the Court may deem just and proper in light of all the circumstances of this case.

**JURY DEMAND**

   Plaintiff demands a trial by jury.


Dated: New York, New York
   November 5, 2007

             By: _____

             **WOLF POPPER LLP**

             Robert C. Finkel (RF 2373)
             James A. Harrod (JH 4400)
             845 Third Avenue
             New York, NY 10022
             Tel.: 212.759.4600
             Fax : 212.486.2093

             Attorneys for Plaintiff